The MENNEN COMPANY, Plaintiff,

v.

The GILLETTE COMPANY, Defendant.

No. 83 Civ. 2146 (MP).

United States District Court,
S.D. New York.

May 27, 1983.

Davis, Hoxie, Faithfull & Hopgood, New York City, for plaintiff; Caspar C. Schneider, Jr., Arnold Dompieri, and Peter H. Bucci, New York City, of counsel.

Cooper, Dunham, Clark, Griffin & Moran, New York City, for defendant; Marie V. Driscoll, and Jules P. Kirsch, New York City, of counsel.

## OPINION and DECISION

MILTON POLLACK, District Judge.

This case arising under the Trademark laws, 15 U.S.C. § 1114, et seq., was tried to the Court at a bench trial. Jurisdiction is based on 28 U.S.C. § 1338. Pursuant to Rule 65(a)(2) the hearing of the application for a preliminary injunction was consolidated with the action on the merits.

Mennen is a worldwide manufacturer and marketer of toiletries for men, women, and children. Particularly involved in this suit is the labeling on the packaging of its deodorants and antiperspirants.

Mennen makes and sells a stick deodorant, a solid form of underarm protection, which it markets under the registered trade name SPEED STICK. Caps on the packages are in different colors, according to the fragrance contained therein. Its products are packaged with descriptions of the contents thereon and prominently display that the product is "by MENNEN." The products are variously denominated as SPEED STICK, Pushbutton Deodorant, Spray Deodorant, Mennen Shave Talc, Mennen Bath Talc, Mennen Prop Electric Pre Shave, Mennen Brushless Shave, Mennen Lather Shave, SOFT STROKE SHAVE, Skin Bracer After Shave, AFTA After Shave Skin Conditioner, and PROTEIN 29 Hair Groom.

Beginning in about 1966, Mennen labeled its packaged products, not only "by MENNEN," and with a descriptive trade-mark registered identification of the product enclosed, but with two short, parallel, separated, colored stripes originally in diagonal position on the package, and in subsequent years Mennen also used horizontal as well as diagonal stripes on the face of their packages. Although, for convenience, the diagonal stripes have sometimes been referred to in this case as a "chevron," that word has no significance or effect herein; it has never been used or advertised publicly outside of the Mennen Company, has never appeared as such in any public way to describe the stripes that it uses; it was just a handy word utilized for internal convenient reference for its own sales organization. At all events, the stripes are not in the form of a chevron, which all parties understand to be an inverted "V". Over the years, on various of its packaged products, Mennen has entirely dropped the use of such stripes from the face of its packaging, but it continues its marketing of such items without stripes, e.g., PROTEIN 29, Skin Bracer After Shave and Skin Bracer AFTA After Shave Conditioner. It also dropped the stripes on the face of its packaging of deodorants for six months in 1979, and again for periods of time in both 1982 and 1983, when it engaged in promotional selling campaigns leaving exposed only the trade mark registered name of the product

and the "by MENNEN" identification. Mennen has never obtained registration as a trademark of either its horizontal stripes or its diagonal stripes, and it has never used the symbols (R) or (TM) in connection with such stripes portrayed on any packaged products. It has uniformly noted on its packaging that the name of the product was a registered (R) trademark. At all times its packaging prominently displayed that the item was "by MENNEN."

In February, 1981, Mennen filed an application in the Patent Office to register its horizontal stripes, then used on its antiperspirant stick. On June 18, 1982, this application was rejected on the grounds that the purported mark was confusingly similar to a design already registered by another company, and that the matter presented for registration appeared to the Patent Office to serve only an ornamental function, and as such, they said, does not serve the purpose of indicating origin of the goods in the application.

The double stripes used on Mennen's packaging, when used, are no more than a reasonably common (among the leading manufacturers) graphic design accompanying the trademarked product named thereon, and the information that the product was "by MENNEN." Mennen also sells its products through a subsidiary for department store sales, the packaging of which does not display its name or its product trademark, nor any diagonal stripes; those items are sold through its subsidiary, Scannon Ltd., and do not in any way identify Mennen as the source of the goods; a customer would not know that it is a Mennen product; it is sold under the name of the vendors such as Gucci or Lanvin.

In this case Mennen has sued the Gillette Company for common law trademark infringement, false designation of origin, and false descriptions or representations in connection with the sale of its goods, in violation of 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act), deceptive acts or practices in violation of Section 349 of New York's General Business Law, false advertising in violation of Section 350–a of New York's General Business Law, and injury to business reputation and trademark dilution in violation of Section 368–d of New York's General Business Law.

Gillette is a competitor of Mennen in the deodorant and antiperspirant field. Gillette manufactures and markets its trademarked RIGHT GUARD line of deodorants and antiperspirants. It has sold deodorant bearing the RIGHT GUARD trademark for at least 23 years. Products bearing the RIGHT GUARD trademark have been extensively advertised and sold, and RIGHT GUARD Aerosol Deodorant, in particular, has enjoyed a substantial market share. RIGHT GUARD, as applied to deodorant products, has become a well-known trademark.

Commencing in 1977, Gillette began to sell a pump spray deodorant showing the RIGHT GUARD trademark on a single color black band in diagonal position. In 1978, RIGHT GUARD began to sell a stick deodorant showing the RIGHT GUARD trademark on a two-colored diagonal band.

In the proposed restaging of the RIGHT GUARD product line to freshen its appearance, Gillette has begun to market its products in newly designed packages showing a two-colored stripe without any separation between them in a diagonal slant. The newly dressed product has not made much of an appearance on retailers' shelves as yet. All of the product containers and packaging in the restaged RIGHT GUARD line are color-coded to show whether the product is a deodorant (bronze stripe) or anti-perspirant (silver stripe) and to show the particular fragrance of each product. Gillette plans to commence a major advertising and promotional campaign of its newly packaged RIGHT GUARD products on June 1, 1983.

Gillette's new packages containing RIGHT GUARD solid stick products manufactured in cylindrical form are in tubes approximately 1⅝ inches in diameter and 4⅝ inches tall. These tubes are sold in rectangular boxes approximately 3 inches wide, 1⅞ inches deep and 4⅞ inches high.

The boxing prominently displays the accurate weight of the product.

The restaged diagonal dress of Gillette's RIGHT GUARD deodorant products is substantially similar to the diagonal dress carried on the same products from at least 1978 without any complaint from Mennen. In that dress, it was widely and nationally advertised on Gillette's deodorant products.

National competitors of Mennen in the personal care products lines have utilized some form of two-colored diagonal stripe or ribbon on their packages for years in both free-standing style as well as extending across the face of the package. The most distinct aspect of the Mennen stripes on its packages is the separation of the two colored stripes separated from each other by a space. Mennen has specifically disclaimed any complaint by reason of any similar color combinations used by Gillette.

Plaintiff's right to injunctive relief under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a) depends on a determination that the defendant's use of a two colored stripe diagonally across its packaging is likely to cause confusion, or to cause mistake or deceive, not merely of purchasers nor simply as to source of origin.

The Lanham Act specifically recognizes that not only words or names may be trademarks but that the term "trademark" also includes "any * * * symbol or device" adopted by a manufacturer to identify his goods and distinguish them from those manufactured or sold by others. 15 U.S.C. § 1127.

Section 43(a) of the Lanham Act encompasses a broad spectrum of marks, symbols, design elements and characters which the public directly associates with a single producer or its products and that only a likelihood of confusion or deception need be shown in order to obtain equitable relief.

■ The law regarding trademark infringement is well-settled. In order to establish protection for its unregistered mark, plaintiff must establish that the double stripes are a non-functional part of the product and that it has acquired a second-ary meaning. *Dallas Cowboys v. Pussy Cat Cinema*, 604 F.2d 200 (2d Cir.1979). To determine whether a product has attained secondary meaning, the Court must determine whether the mark has been so associated in the mind of consumers with the entity that it identifies that the goods sold by that entity are distinguished by the mark or symbol from goods sold by others. Thus, the question is whether the primary significance of the double stripes points to the producer of the product.

■ Plaintiff has failed to carry its burden with credible evidence to establish that the Mennen stripes have acquired secondary meaning. Moreover, there is no actual or subliminal similarity between the Mennen stripes and the Gillette stripe, as we shall see later.

■ Mennen set forth survey evidence that purported to show that 63% of the public canvassed, associated the Mennen stripes with the Mennen company. However, this survey was shown to be fatally defective and untrustworthy in a number of ways. In this survey, respondents were shown the Mennen stripes and asked:

"Please look at this picture and this list of stick deodorant brand names. Among the leading brands of stick deodorant now on the market, which of the brands listed here would you say uses these stripes on their package?"

The respondents were then shown a list of manufacturers. While 63% of the respondents selected Mennen from the array, this was merely a playback of brand share in response to a highly suggestive, aided question, in which respondents most likely pointed to Mennen as it was the major producer of stick deodorants. The test failed to come close to replicating the appearance in which consumers actually perceive deodorant and anti-perspirant products on the shelves. There is no credible reason to believe that the stripe marks themselves alone elicited the response "Mennen." To the contrary, it is more likely that the prompting and suggestive nature of the question were responsible for

eliciting the response. The objectivity of the entire survey process was not assured. The exhibits used in the survey did not fairly represent the actual products or the symbols thereon. The respondents were selected at the discretion of the interviewers.

Moreover, plaintiff failed to carry its burden with credible evidence to establish that the universe of the survey was representative of the consuming public. Additionally, the independence of the design was suspect. These are only examples of what the evidence showed to be a succession of defects in the survey as credibly pointed out by defendant's unquestionable expert.

Numerous other factors suggest that Mennen has failed to acquire secondary meaning in its stripes. The Mennen Company did not advertise products bearing the stripes, on television, at any time during the 6 year period 1969–75. Similarly, Mennen has been unable to establish that it engaged in any print advertising of deodorant or anti-perspirant products bearing the stripes from 1969–1974 or from 1981–1982. Mennen has never used advertising in which it explicitly, in words, called the attention of consumers to the stripes design and specified that they were a trademark.

Moreover, on several occasions, Mennen itself actually eliminated the Mennen stripes from its packaging. In 1979, for six months, the stripes were eliminated in order for Mennen to announce a new formula. In 1970 and in 1982–83, the stripes were eliminated in order to offer a price discount showing the burst design. These examples clearly reflect that Mennen itself viewed its unique package shape and the name "Mennen" on the labelling and the registered brand name "Speed Stick" as the features of the packaging having consumer recognition. Mennen has never used its diagonal stripes on its SPEED STICK antiperspirant stick. The SPEED STICK antiperspirant stick has shown three different designs of stripes.

The exhibits clearly demonstrate that a number of competitors in the deodorant and anti-perspirant line use stripe marks fundamentally similar to plaintiff's marks on their products. For example: SURE, Old Spice and Suave for years have used vivid diagonal stripes on their packaging. Diagonal stripes in no way identify merely the Mennen products in the market. The principal manufacturers in the field have used color stripes on their deodorant and antiperspirant packaging for many years without any complaint from plaintiff. In particular, Mennen never complained about the diagonal stripe design on the Gillette Right Guard packaging which was imprinted thereon and carried from 1978 down to date.

Mennen introduced a Dial deodorant advertisement in an effort to show that Mennen is known in the marketplace by its stripes. The advertisement in question included a depiction of the Mennen Speed Stick container with its unusual shape and the Mennen stripes. Plaintiff suggested that this advertisement indicated that the Mennen product is identifiable merely by its stripes. To the contrary, this advertisement simply shows the recognition power of the shape of the Mennen container, a feature of Mennen's trade dress not in issue here.

Mennen has also failed completely to show with credible evidence any likelihood of confusion. There must be a likelihood of confusion of an appreciable number of buyers in order to establish liability for trademark infringement or unfair competition. Here again, the plaintiff bears the burden of proving by a preponderance of the credible evidence that likelihood of confusion exists. The factors to consider in evaluating whether there is a likelihood of confusion include the following:

1. The strength of the plaintiff's mark
2. The similarity of the marks
3. The proximity of the products
4. The sophistication of the purchasers
5. The evidence of actual confusion
6. The motive of the defendant in choosing the mark
7. The quality of the defendant's product.

With regard to the first factor, as found above, Mennen has failed to establish that its stripes have acquired a secondary meaning. At all events, the recognition power of the stripes is very low.

Mennen has offered survey evidence in an effort to show the requisite confusion. In this part of the survey, respondents were shown a facsimile of the Gillette stripe which had as yet had no market currency (the new look) and were asked the exact same suggestive question regarding the manufacturer of a stick deodorant. 57% of the respondents thereupon indicated that the stripe reminded them of the Mennen Company. The Gillette lime and bronze color combination shown to the respondents was not yet on the market. Survey evidence in such circumstances fails to support a finding of likelihood of confusion. The defects regarding the survey sample noted above are again relevant here. In particular, the suggestive nature of the question in which respondents were told that they were being asked about a stick deodorant was to suggest the best known and largest distributor, the Mennen Company, wholly apart from the stripes exhibited.

The survey designer himself stated that his survey did not evaluate the effect of the label as a whole.

THE COURT: In other words, *you realized that the appearance of the shelf was wholly diverse from the isolated appearance of a couple of bars in the survey,* isn't that right?

THE WITNESS: *Absolutely.*

THE COURT: And every shelf that you have ever seen, *the identity of the distributor or the marketer is indicated by the name of* the marketer *or his trademark* name? Is that so?

THE WITNESS: *Yes,* but I wasn't being asked—

THE COURT: Didn't you consider whether that had any influence on the fairness of taking in isolation a couple of bars and asking whether those bars could be identified with one or another of the manufacturers?

THE WITNESS: *The bars in isolation were all that I was asked to research. I was not asked to research labels. Had I been asked to research labels, I might have done it differently.*

THE COURT: *Had you researched the labels that were used on these packages, you couldn't possibly have utilized only the bars to determine the reaction of people to the identity of the label, could you?*

THE WITNESS: *Absolutely not.*

■ Not only is there thus no evidence to sustain the notion of confusion, but the Gillette stripe is not similar to the Mennen stripes. Comparison thereof either by their detail, their overall impact or their effect on the packaging as a whole, reveals substantial differences in appearance.

The Gillette multicolored single stripe is substantially bolder and broader on the packages than Mennen's two separated stripes. The Mennen stripes are distinctive in that the color bars are separated by a space. In addition, the color arrays of the marks of the two companies are different and this accounts for plaintiff's concession on inquiry by the Court that no claim is asserted based on color similarities.

The contrasting overall effect of the stripes themselves viewed in their entireties is enough to deny similarity and avoid confusion in the market place without any reference to the RIGHT GUARD trademark affixed thereto.

The name and dress of defendant's product were selected from a progression of studies of Gillette's own marks and were used in good faith, in the exercise of reasonable and honest judgment and without intent to infringe on the dress of the plaintiff's product. To the contrary, Gillette undertook substantial efforts to assure that the public and the trade would associate the new look of the new line with the reputation of Gillette's own old look and not that of Mennen. Gillette did not try to look like Mennen.

The use by Gillette of its new RIGHT GUARD graphics, including the stripe or

band design, does not create a likelihood that consumers will believe that its products originate with or are in some way sponsored, approved by or associated with Mennen.

The second principal claim of Mennen is directed at the sizing of the package used by Gillette.

Basically, we consider here what consumers react to and what the consumer's expectations are in the market place. Plaintiff relies both on federal and state law principles.

▪ Section 43(a) of the Lanham Act prohibits a seller from using any false description or representation in connection with any goods or services. A plaintiff may obtain injunctive relief under Section 43 even if it cannot prove that actual sales were diverted from it. Injury and cause will not be presumed but studies that demonstrate that the ads or representations tend to mislead can establish the link. All that a plaintiff need establish is that a non-insubstantial number of consumers would be misled.

▪ Under state law plaintiff claims that Gillette's packaging violates Sections 349 and 350 of New York General Business Law. Section 349 provides:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

In applying this statute, the standards developed in applying Section 5 of the Federal Trade Commission Act 15 U.S.C. § 45 are the guidelines. Thus, in determining whether challenged acts violate Section 349, the plaintiff need not show the intent of the seller to deceive. Also, the plaintiff need not show any specific injury. The test is simply whether the act complained of has the capacity to deceive. This capacity to deceive is not tested by reference to the average consumer but rather must be construed to protect the vast multitude which includes the ignorant, the unthinking and the credulous.

Section 350 provides:

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

▪ To establish a claim under this Section, intention to deceive need not be shown. Also, a plaintiff need not prove actual damages but merely that an advertisement is materially misleading. As under Section 349, the test is not what the average consumer would think, but rather the "vast multitude."

Deodorants and antiperspirants are sold in many diverse primary container shapes and sizes and, in some instances, in boxes larger than physically required by the size of the primary container.

▪ All the claims related to the box size fail as plaintiff has not shown that the size of the box has any capacity to deceive. Plaintiff attempts to introduce survey evidence to show that consumers feel that the box contains more deodorant than is actually the case. In this survey, the respondents were shown a 2.5 ounce container of the old packaging of RIGHT GUARD and the new box for a 2.5 ounce container. Respondents were asked which package they thought contained more deodorant. The results were as follows:

56 percent of the respondents stated that the two packages contained the same amount. 29 percent thought that the box container had the larger quantity.

The circumstances under which this part of the survey were conducted were extraordinarily unreliable. There is no reliable indication of the visibility at the viewing distance from the products at which the respondents were located, or indeed of their physical viewing capacities. The respondents were not allowed to pick up or open the containers or to draw them close enough for reading purposes, although they would clearly be able to do this when examining merchandise shelved in stores. While the time allowed for viewing the products was five seconds, no reliable means were used to actually time the demanded response and there is no indication that the

respondents were actually allowed even that short time to view the products or appreciate what they were asked to comprehend.

Mennen's witness testified that there are no standards of product size and box dimension in the industry. Indeed, many of the competitive products are boxed in containers that exceed the proportions of their inner containers by more than is the case for the Gillette products. Given this factor, the failure of the survey to compare the Gillette box with comparable boxes is particularly important. Mennen itself has varied product content without changing container size.

Finally the problems related to the survey universe are again applicable.

The evidence also demonstrates that Gillette chose the container design for legitimate business purposes such as physically protecting the product, improving the dispensing thereof, and providing shelf stability [preventing the product from tipping over on the shelf]. Plainly, the record is totally devoid of any injury to Mennen relating to Gillette's packaging size.

Parenthetically, it is noted that the plaintiff, in its amended complaint, does not seek to enjoin the use of the allegedly oversize boxes as part of the demanded relief.

■ Relying on Section 368–d of New York General Business Law, plaintiff asserts claims based on alleged dilution of its mark from defendant's acts which it says should be enjoined as capable of damage to Mennen's reputation.

This Section provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief of a mark registered or not registered in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

Repeating its claim that the stripe used by Gillette is associated in the mind of the public with Mennen *and* given the claimed misleading dimensions of the box, plaintiff asserts that the public will come to think adversely of Mennen when it discovers that the RIGHT GUARD products that it purchases are deceptively packaged. Plaintiff failed to establish either of the essential underlying assumptions that it makes. It has not been credibly established that the public associates the Gillette stripe with the Mennen company or that the public is deceived by the size of the packaging.

■ While Section 368–d does protect commercial goodwill and the selling power of a mark, to make out a claim under this section, plaintiff must establish that it has a strong mark, one which is at least descriptive with secondary meaning. Also, plaintiff must show that there may be a whittling down of the identity or the reputation of plaintiff's mark. This can result either by a blurring of the product identification of the mark or by tarnishing the affirmative association that the mark has come to convey. Predatory intent is not a necessary element of a claim under this Section. The only elements necessary for a claim are the possession of a distinctive mark and the likelihood of dilution. The statute protects marks that are distinctive or that have acquired secondary meaning.

■ Plaintiff's claim on this branch fails for a number of reasons. The Mennen mark does not have sufficiently strong identification to come within the scope of the section as the mark has not acquired secondary meaning. Further, the plaintiff has failed completely to suggest or prove credibly any way in which the use of the stripe by Gillette will blur product identification of Mennen, given the differences between the Mennen double lines and the Gillette single stripe, the awareness of the consumers of the different source of the products and all the other facts and circumstances of the case.

Gillette's use of its single multi-colored stripe will not impact on or dilute the parallel separated Mennen stripes or prejudice any association that could be made of those separated stripes with Mennen.

There is a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy. As such it carries necessary damage to the defendant when the plaintiff's claims are found, as they are here, to have no real substance.

Accordingly, each of the claims asserted herein is dismissed on the merits, with costs and counsel fees to the defendant, to be assessed and entered in the judgment upon appropriate proof with legal support of the reasonable value of necessary and compensable services under the statute. Submit judgment on notice.

The foregoing shall constitute the findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.