**DIAMOND SUPPLY COMPANY,**
**Plaintiff,**

v.

**PRUDENTIAL PAPER PRODUCTS CO.,**
**INC. and Midtown Paper and Supply**
**Company, Defendants.**

**No. 81 Civ. 6891 (KTD).**

United States District Court,
S.D. New York.

June 19, 1984.

James & Franklin, New York City, for plaintiff; Robert Epstein, New York City, of counsel.

Blum, Kaplan, Friedman, Silberman & Beran, New York City, for defendants; James K. Silberman, Steven Hartman, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff Diamond Supply Company ("Diamond") commenced this action against Prudential Paper Products Company, Inc. ("Prudential") and Midtown Paper and Supply Company ("Midtown") alleging violations of federal trademark law, and state law. I held a bench trial on this matter from April 3, 1984 to April 5, 1984. The following shall constitute my findings of fact and conclusions of law.

Plaintiff Diamond is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Both defendants are New York corporations with their principal places of business in New York, New York. Plaintiff is a wholesale distributor of stationery supplies. It sells its products to retail stationery stores, pharmacies, supermarket chains, and department stores, for resale to the general public. Prudential, on the other hand, manufactures paper products and sells its goods to wholesalers—such as Diamond— and to a lesser extent, directly to retail stores. For over twenty-five years, until 1979, Prudential was essentially Diamond's sole supplier of paper goods including wire-bound composition notebooks, typing paper, and filling paper. Diamond sold some of its products under its "private label" consisting of the term "Garden State" with a New Jersey Map design and the designation "Distributed by Diamond Supply Co.— New Brunswick, New Jersey." "Private label" goods of small distributors is to be contrasted with sales of national brands by

national distributors (such as Prudential). Plaintiff has been selling its private label goods since at least 1955. In 1979, Diamond's private brand gross sales were $146,000; in 1980, the amount was $140,000. Less than 30 percent of Diamond's sales are to customers outside of New Jersey, and these are divided between New York and Pennsylvania.

The advantage to Diamond of selling private label goods involves the opportunity for sales to smaller, independent retail outlets. These stores apparently would have trouble matching large chain store retailer's prices on national brands. Therefore, these independent stores sought out differentiated private brand products to reduce direct price competition.

Prudential manufactures private label goods for only a few wholesalers, constituting less than 5 percent of its gross sales.[1] Prudential's primary sales are in its own brands, and Diamond itself purchased some of these goods for resale. The products in dispute in this case involve Diamond's private label wire-bound spiral notebooks.

Prior to 1978, a Prudential salesman would meet with a Diamond representative early each year to discuss prices for the private label goods. At trial, Diamond's president William Salzberg contended that at this January meeting each year Diamond also would calculate its expected requirements for the upcoming year and that Prudential would orally agree to manufacture and floor stock the entire year's requirement by approximately March. I do not find this a credible understanding of the

two parties' obligations. Rather, I find that as with all of its customers, Prudential utilized a "minimax" inventorying system to project plaintiff's requirements on an ongoing basis, and then manufactured the private label goods accordingly.[2] If Diamond ordered goods that Prudential did not have on hand, Prudential would supply plaintiff with comparable Prudential non-private label goods and or "back-order" the goods. By back-ordering, defendant would manufacture the nonsupplied goods as expeditiously as possible.[3] On the other hand, if Prudential manufactured goods not subsequently ordered by Diamond, Diamond would purchase the surplus goods at year's end.[4]

Beginning in 1978, the new president Salzberg requested and Prudential agreed, to have a Prudential salesman visit Diamond at least once every month. The salesman, Edward Stelzer, would carry out the minimax calculations at Diamond's warehouse, and take any orders that plaintiff had. Plaintiff also continued to make telephone orders to Prudential during this time period.

From March 1979 to July 1979 Prudential filled all of Diamond's orders for private label goods. A large percentage of plaintiff's sales normally would be concentrated soon thereafter during the "Back-to-School" phase from approximately mid-August to mid-September. On August 8, 1979, during a visit by Prudential's salesman Stelzer, Diamond placed an order that Prudential was only able to fill in part the following day.[5] On September 4, 1979,

---

1. In 1979, in fact, private label goods may have constituted less than 1 percent of Prudential's gross sales. *See* Testimony of Alan Hodes (Prudential President) on April 4, 1984.

2. Defendant stated that though plaintiff's anticipated sales were discussed, floor-stocking of the entire expected sales months in advance was not part of their oral agreement. This perception of the parties' agreement was far more credible.

3. Often, Prudential would have on hand manufactured covers with Diamond's private label. Nonetheless, back-ordering might be necessary because of the time needed to attach these covers to the paper and the spiral wire thereafter.

4. Occasionally, Prudential would carry-over small quantities of private label goods to the following year.

5. On August 8, 1979, plaintiff ordered the following:

| | | |
|------|---|-----------|
| WB 15 | – | 384 dozen |
| WB 20 | – | 84 dozen |
| WB 65 | – | 144 dozen |
| WB169 | – | 60 dozen |
| 300-5 | – | 76 dozen |
| GF-1 | – | 24 dozen |
| WB100 | – | 12 dozen |

plaintiff made a small order which defendant could not fill at all with private label goods.[6] In both cases, Prudential substituted equivalent goods with its own label. The option of keeping or returning the substituted goods was Diamond's choice. On September 12, 1979, during a visit to Diamond, Stelzer authorized the return of some of the substituted goods; Diamond also retained some of them.[7]

Salzberg asserts that at this visit he indicated to Stelzer that Prudential was not meeting its obligations under the agreement, and that plaintiff would seek another private brand supplier. The objective and credible facts belie this assertion except to the extent that Salzberg did seek another supplier over the following months. For example, on September 17, 1979, Prudential sent Diamond a letter notifying it of the new price list for the coming year, citing the leftover goods on hand which Diamond was obligated to purchase by year's end. This letter, five days after Salzberg claims he notified Stelzer of the termination of their contract, makes no reference to a putative abrogation of plaintiff and defendant's twenty-five year relationship.[8] On September 26, 1979, plaintiff returned some of the substituted equivalent goods. Although Salzberg asserts that the equivalent Prudential products were "completely

unacceptable," Diamond retained some of the substituted goods. Furthermore, plaintiff did make a small order for private label goods after its supposed September termination of the contract.

Furthermore, although both Stelzer and Salzberg testified that at the September 12, 1979 meeting they agreed that Stelzer would no longer visit Diamond once a month, I find that this was not a result of the contract termination. They merely were reverting back to the prior longstanding practice of having a Prudential salesman visit Diamond only once at the beginning of the year. The above facts are thus inconsistent with Diamond's assertion that it notified Prudential of the termination of its contract. Indeed, it appears that plaintiff, not defendant, failed to attempt to resolve their differences; Salzberg did not deny that he refused to answer or return any of Stelzer's telephone calls over the following weeks.

During the late fall or winter of 1979, Diamond negotiated and contracted with Roaring Springs, Inc. ("Roaring Springs") to manufacture Diamond's private brand goods. There was a delay, however, before Roaring Springs was able to begin manufacturing Diamond goods. According to Salzberg, this delay resulted in the loss of

---

On August 9, 1979, defendant supplied the following, with the second items representing equivalent substituted Prudential goods:

| | | |
|---|---|---|
| WB 15 | – | 300 dozen + 80 dozen of S-4850 |
| WB 20 | – | 76 dozen + 8 dozen of EN80k |
| WB 65 | – | 82 dozen + 62 dozen of S-200 |
| WB169 | – | NONE + 60 dozen of S69200 |
| 300-5 | – | 62 dozen |
| GF-1 | – | NONE |
| WB100 | – | NONE |

**6.** On September 4, 1979, plaintiff ordered:

| | | |
|---|---|---|
| WB 169 | – | 48 dozen |
| WB 40 | – | 72 dozen |
| WB 65 | – | 48 dozen |

On September 6, 1979, Prudential shipped:

| | | |
|---|---|---|
| WB 169 | – | NONE + 48 dozen S69200 |
| WB 40 | – | NONE + 72 dozen K821 |
| WB 65 | – | NONE + 48 dozen K200 |

**7.** On September 26, 1979, plaintiff returned the following items to Prudential:

| | | |
|---|---|---|
| EN80K | – | 8 dozen |
| S69200 | – | 60 dozen |
| S69200 | – | 46 dozen |
| K821 | – | 72 dozen |

**8.** The September 17th letter provided in relevant part:

These are your special prices effective as of September 17, 1979.

Please make a note of them and adjust your suggested retail accordingly if you haven't done so already.

I wish you and all a very Happy, Healthy and Successful New Year.

Regards,
Ed

Plaintiff's Exhibit 13. A postscript that followed quoted certain finished and unfinished Diamond private label goods remaining in Prudential's inventory and stated: "Please try and draw against them as soon as possible so we can be clean before our December [warehouse-wide] inventory." *Id.*

virtually an entire quarter's revenues.[9] Furthermore, Salzberg testified, many of Diamond's customers were "desperate" for goods that Diamond could not supply. He contended that this resulted in the permanent loss of a few customers.

Diamond's revenue loss, however, was of its own making. Prudential's September 17, 1979 letter revealed an existing supply of private brand goods. If Diamond were as desperate for private goods as Salzberg maintains, it could simply have ordered some of the goods Prudential had ready-made and/or on hand. Salzberg's refusal to deal with Prudential any longer, and even to refuse to answer or return Prudential's phone calls, exacerbated his company's supply bind. Furthermore, Salzberg claimed that the substituted Prudential goods were "unacceptable." Yet, save for the private label cover, the goods were identical. Moreover, plaintiff had, in the past, occasionally accepted the substitute goods for resale. Thus, the "desperate" shortage of goods experienced by plaintiff in the fourth quarter of 1979 was in part hyperbole, and in part self-induced.

By December Prudential was aware that plaintiff was no longer ordering its private brand stock and Diamond still refused to take or return Prudential telephone calls. In early 1980 at a toy fair, Prudential's President Alan Hodes met Salzberg. At that point Salzberg indicated that he did not care what Prudential did with the Diamond goods still in Prudential's inventory, a fact Salzberg repeated at trial. Therefore, Prudential discarded the unattached wirebound notebook covers printed with Diamond's private label.

Nevertheless, by letter dated May 4, 1980, Prudential again notified Diamond of the private label goods—finished goods only—which it had in its inventory. This amounted to 284 cartons worth approximately $6,100. Diamond chose not to respond. Therefore, Prudential sold some in "odd lots," [10] gave away some to charity, and was able to sell in July 1980 and in June 1981 at reduced prices a total of seventy-eight cartons to Midtown, and in September 1980, one carton to Barco-Ben Gold, another stationery distributor. The profit on the sales to Midtown and Barco-Ben Gold was approximately $80.00 to $100.00.

Plaintiff argues that the different inventory quantities quoted in the September 17, 1979 and May 4, 1980 letters as well as defendant's October 2, 1979 production evaluation report demonstrate that Prudential manufactured and disposed of a large quantity of Diamond goods which it has refused to account for. Plaintiff's assertion is baseless. Hodes credibly testified that inventory quantities approximated in the September letter included both finished and unfinished goods, whereas the May letter only cited finished goods remaining in Prudential's inventory. Unattached notebook covers bearing Diamond's private label had been discarded by May 1980. Furthermore, defendant's production reports support Prudential's rather than Diamond's assertions. These reports cover production for the entire period from August 24, 1979 to October 2, 1979. Thus, much of the goods produced were already reflected on the September 17th letter, and were not goods manufactured later. In addition, the reports reveal that no other Diamond private label goods were produced after that date, further supporting defendant's contentions.

In the fall of 1981, Diamond became aware that Midtown had certain Diamond private label goods for sale. Diamond's Vice-President and co-owner, Alan DiGiovanni went to Midtown and purchased on November 3, 1981, one carton of goods. On November 9, 1981, Diamond commenced this action. Its complaint, which contained three causes of action, alleged: (1) false designation of origin in violation of

---

**9.** Although this assertion may have been exaggerated, apparently Diamond's gross sales did decrease from $146,000 to $140,000 from 1979 to 1980, whereas in the preceding ten years gross sales generally had increased.

**10.** Sales in "odd lots," Hodes testified, were made at reduced prices and per pound rather than per carton.

the Trademark Act of 1946, 15 U.S.C. § 1125(a), (2) common law unfair competition, and (3) trademark dilution in violation of N.Y.Gen.Bus.Law § 368–d (McKinney 1968). On December 30, 1981, I entered an order preliminarily enjoining the defendants from selling any of plaintiff's products. Defendants had consented to the entry of a preliminary injunction stating that they had little or no inventory of plaintiff's goods.

Having now heard the testimony and examined the exhibits proffered by the parties over the course of the two and one-half day bench trial, I conclude that plaintiff has failed to sustain its burden of proof on any of its claims, and the complaint is dismissed.

### I.

■ Plaintiff's first cause of action is based on 15 U.S.C. § 1125(a) which provides in relevant part:

(a) Any person who shall affix … a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ….

The essence of the section 1125(a) claim is whether there is any likelihood that the public will be misled or confused. *See Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In the instant case, however, there is no possibility of confusion because the goods sold are not distinct but deceptively similar goods; rather, they are genuine Diamond goods. In a recent factually similar case, the Ninth Circuit affirmed summary judgment dismissing a trademark claim based on the unauthorized sale of genuine goods that had been rejected by plaintiff because of their late delivery. *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.*, 707 F.2d 1054 (9th Cir.1983). In *Monte Carlo*, the court stated:

[T]he injury that is remedied by the trademark cause of action is public confusion as to the source of the goods …. No such confusion was possible in this case. The goods sold by Daewoo were not imitations of Monte Carlo shirts; they were the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale. … Their source was Monte Carlo; the absence of Monte Carlo's authorization of the discount retailers to sell does not alter this…. *Cf. DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 622 n. 1 (2d Cir.1980) (noting in dictum that it would be anomalous if "a trademark infringement action would lie where the [defendant's product] is in fact genuine and not spurious").

707 F.2d at 1058 (citations and footnote omitted).

■ Plaintiff attempted to rebut this inescapable conclusion by arguing that its goods subsequently produced by Roaring Springs were superior to the Prudential-manufactured Diamond private label goods. The exhibits introduced into evidence at trial, however, demonstrated that except for minor stylistic differences including graphics, the goods were either identical or qualitatively equivalent.[11] Plaintiff's argument is particularly specious because whatever guarantees of quality it had concerning these goods were backed up by Prudential. Any goods returned to Diamond were thereafter returned by Diamond to Prudential for re-

---

**11.** For example, the notebook paper is purchased by both Prudential and Roaring Springs from the same manufacturer.

placement. Moreover, Diamond's instructions to Prudential to do whatever it wanted with the leftover goods effectively waived this complaint. Finally, plaintiff's argument ignores the fact that the goods sold by defendant were genuine unaltered goods which were manufactured on its behest and sold in the normal course of Prudential's business. No public confusion can have resulted from such transactions.[12]

## II.

■ Plaintiff's causes of action for trademark dilution and common law unfair competition are similarly defective. Section 368–d of New York's General Business Law provides in full:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1968).

As I have already stated, the goods sold by Prudential were genuine Diamond private label goods, essentially identical to the subsequent private label goods manufactured by Roaring Springs. Plaintiff, moreover, waived these claims by stating that defendant could do what it wished with the leftover inventory. Thus, for many of the reasons previously discussed above, plaintiff failed to establish any unfair competition, likelihood of injury to its business

reputation, or dilution of its alleged trademark.[13]

In sum, therefore, plaintiff failed to carry its burden of proving any of its three causes of action. I turn, thus, to the last issue, which concerns attorneys' fees.[14]

## III.

■ Section 1117 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Both parties have moved for attorneys' fees; Diamond, obviously, is not a prevailing party and therefore its cross-motion is denied. Prudential asserts that this was a frivolous lawsuit pressed only to harass and to coerce a settlement. Although I agree that the action was without merit, I cannot find from the evidence presented at trial that plaintiff intended only to harass Prudential into obtaining a settlement.

On the other hand, plaintiff's assertion of this action against Midtown was so patently baseless that it does present "an exceptional case." Diamond presented virtually no evidence whatsoever against Midtown. Obviously, Midtown sold but did not produce the Diamond goods in question; thus, to have established liability, plaintiff would have had to have established knowing infringement by Midtown. *See* 15 U.S.C. § 1125(a). Plaintiff fell woefully short in presenting such proof of intent. Its pursuit of this action constitutes bad faith and harassment. Accordingly, defendant is entitled to reimbursement for that amount of

---

**12.** In fact, in a breach of contract action defendant would be required to mitigate its damages. Sale of the goods, thus, would appear to have been mandated. Defendant's breach of contract counterclaim against Diamond was withdrawn at trial.

**13.** I note that the state law dilution cause of action would require that plaintiff have a valid trademark. Proof of such a trademark at trial, however, was scant; nevertheless, it is not necessary to determine plaintiff's trademark's validity because it failed to carry its burden of proof

on the elements of unfair competition and likelihood of injury to its business reputation.

**14.** On the eve of trial, plaintiff also sought to assert a breach of contract cause of action. Plaintiff did not amend its complaint. Moreover, such a tardy attempt would have been denied as prejudicial. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In addition, as my credibility determinations above imply, Diamond is the only party that may have breached the contract in this case.

time that defendants' counsel expended in defending this action as against Midtown.[15]

In sum, plaintiff's complaint is dismissed. The Clerk is directed to enter judgment accordingly. Appropriate documentation of attorneys' fees should be submitted within ten (10) days of the date of this decision.

SO ORDERED.

---

**15.** The same defense counsel represented both Prudential and Midtown.