**IMAF, S.p.A., Plaintiff,**

v.

**J.C. PENNEY COMPANY, INC., Defendant.**

**No. 86 Civ. 9080 (CHT).**

United States District Court, S.D. New York.

Dec. 30, 1992.

Herzfeld & Rubin, P.C., New York City (Peter J. Kurshan, of counsel), for plaintiff.

John B. Rizo, Sr., J.C. Penney Co., Inc., Legal Dept. (Weil, Gotshal & Manges, New York City, of counsel), for defendant.

## OPINION

TENNEY, District Judge:

This application for attorneys' fees arises from a trademark action brought by IMAF, S.p.A. ("IMAF") against J.C. Penney Co., Inc. ("Penney") that was dismissed following a bench trial on the merits. Penney has applied for attorneys' fees, alleging

that IMAF brought this suit in bad faith. The court agrees and grants the application.

## BACKGROUND [1]

IMAF is an Italian knitwear manufacturer that contracted with Penney on two separate occasions to produce sweaters for retail sale by Penney in the United States. In a 1984 order, Penney requested an "Italian sounding name" to use on the labels of the sweaters that Penney ordered from IMAF, which were to be sold in conjunction with Penney's "Salute to Italy" campaign. IMAF suggested the word "Adiansi," which is the surname of two of the company's principals, Mario and Elio Adiansi. Penney agreed to use the name. Both parties were satisfied with the 1984 transaction.

A second order, the subject of this litigation, was placed in 1985. Penney specified the desired label—again, Adiansi. Penney clearly established at trial that Penney had control over the quality of the sweaters, and that IMAF lacked the authority to block shipment based on dissatisfaction with the quality of the sweaters. *See* Opinion 11/10/92 at 3–4.

Before the manufacturing process began, IMAF subcontracted the Penney order to another Italian manufacturer, Primavera, S.p.A. ("Primavera"), without informing Penney.[2] Primavera is considered to be a producer of "goods of average quality," according to one witness. Trial Transcript ("Tr.") at 225 (Testimony of Angelo Savardi). After Penney found out that the order had been subcontracted to Primavera, Penney representatives, through an Italian company called GBS, began working directly with Primavera.

The sweaters were produced two weeks later than Penney had requested. At that time, IMAF sent a representative, Mario

---

1. The facts relevant to the substance of IMAF's claims are discussed in detail in this court's prior opinion of November 10, 1992 ("Opinion 11/10/92"), 806 F.Supp. 449, 451–52. Familiarity with that opinion is assumed.

2. Although the IMAF/Primavera subcontract provided that IMAF was to pay Primavera in

Italian lira, Penney had agreed to pay IMAF in U.S. dollars in the initial contract. Due to a decline in the value of the dollar, IMAF would have lost money on the sale to Penney after paying Primavera if the sale had gone as IMAF had initially planned.

Adiansi, to inspect the goods for the first time. Although he was dissatisfied with the quality of the sweaters, he did not ask that the Adiansi labels be removed, that the sweaters be shipped to IMAF, or that the shipment to Penney be blocked. In fact, three days after Mario's visit, Elio Adiansi sent GBS a telex in which IMAF asked Penney to release IMAF from liability; the telex also stated that IMAF was "reserving all actions and claims—exclusively against Primavera." Exh. 10. Penney accepted IMAF's request and issued a contract cancellation. Exh. AO.

The sweaters ultimately were shipped to Penney in early October; they arrived at Penney's stores for sale in mid-October. No one from IMAF protested when the sweaters were first sold at Penney's stores. When Elio came to the United States in late October to find out what had become of the goods, he saw them on display at a Penney store, with the Adiansi labels intact. Shortly thereafter, IMAF brought a trademark action under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988 & Supp. 1992), which was dismissed by the court.

## DISCUSSION

*I. The "Exceptional Case" Requirement*

Under section 35 of the Lanham Act, a court may award attorneys' fees "in exceptional cases." 15 U.S.C. § 1117(a) (1988 & Supp.1992). Congress' passage of the act was not intended to protect and serve only plaintiffs. The attorneys' fee provision "endeavor[s] to afford protection to defendants 'against unfounded suits brought by trademark owners for harassment and the like.'" *Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant,* 771 F.2d 521, 524 (D.C.Cir.1985) (quoting S.Rep. No. 1400, 93d Cong., 2d Sess. 5, 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7136). The provision applies to cases involving registered and unregistered trademarks alike. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217,

1223 (2d Cir.1987), *aff'g* 652 F.Supp. 1105 (S.D.N.Y.).

When a successful defendant applies for attorneys' fees, this circuit requires that the defendant show the plaintiff's bad faith in bringing the suit. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 77 (2d Cir.1986) (awarding attorneys' fees to the defendant when the plaintiff brought suit only for the purpose of joining in defendant's profits), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Mennen Co. v. Gillette Co.,* 565 F.Supp. 648, 657 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1437 (2d Cir.1984).

In *Mennen,* the plaintiff sued Gillette under section 43(a) of the Lanham Act, 15 U.S.C. § 1125. The court, Milton Pollack, J., dismissed Mennen's claim, reasoning that Mennen failed to establish secondary meaning of the mark in question (two diagonal stripes that Mennen used on deodorant and antiperspirant packages) or a likelihood of consumer confusion.

At trial, Mennen had introduced a consumer survey to establish both factors.[3] That survey was found "fatally defective and untrustworthy." 565 F.Supp. at 652. After going through the numerous problems with the survey, and also dismissing Mennen's other claims, Judge Pollack concluded that there was "a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy. As such it carries necessary damage to the defendant when the plaintiff's claims are found, as they are here, to have no real substance." *Id.* at 657. Consequently, Gillette received an award of attorneys' fees.

In *Viola Sportswear, Inc. v. Mimun,* 574 F.Supp. 619 (E.D.N.Y.1983), the plaintiff brought a Lanham Act claim based on the sale of a single pair of jeans for $10.00 by one of the defendants. The plaintiff also alleged the existence of a nationwide trademark conspiracy based upon the same sale. *Id.* at 621. The court held that the phrase "exceptional cases" would "surely be con-

---

**3.** As a matter of practice, it is appropriate to establish consumer confusion and secondary meaning by the introduction of a consumer survey. *See, e.g., Mattel, Inc. v. Azrak–Hamway*

*Int'l, Inc.,* 724 F.2d 357, 361 (2d Cir.1983) (per curiam) (endorsing not just the introduction of consumer surveys, but also anecdotal testimony at trial by individual consumers).

strued to encompass a case such as this which was without merit. One can only speculate about the motives which prompted this suit and in doing so none that are laudable come readily to mind." *Id.* at 620–21.

In *Diamond Supply Co. v. Prudential Paper Products Co., Inc.,* 589 F.Supp. 470 (S.D.N.Y.1984), the court awarded attorneys' fees to one of two defendants in the action. The court found that, as against that defendant, the plaintiff failed to present any evidence; the court could only conclude that the "patently baseless" action "constitute[d] bad faith harassment." *Id.* at 476.

Echoing the language of *Mennen,* there also were "overtones" in this case that are disturbing, to say the least. Although, as in *Viola Sportswear,* one can only speculate about the real motive behind such a suit, the progress of plaintiff's case at trial certainly supports an award.

## II. *IMAF's Claims as Constituting an Exceptional Case*

### A. Surviving Defendant's Summary Judgment Motion

■ IMAF first contends that because this case survived Penney's summary judgment motion, fees should not be awarded. Judge Wood, denying defendant's summary judgment motion as to the section 43(a) claim, noted that two Benetton managers had seen the Adiansi-labelled sweaters at a Penney store in October of 1985; they later expressed surprise to Elio Adiansi that IMAF would produce goods of such poor quality. *See* Memorandum Opinion of Kimba M. Wood, J., May 12, 1989 ("Opinion 5/12/89"), at 8–9.

In that order, Judge Wood stated that the testimony of these two witnesses presented "strong evidence of secondary meaning." *Id.* at 9. That surely would be the case if these two witnesses were average American consumers or had learned of the association of IMAF with the Adiansi label in the United States. However, Pen-

ney elicited at trial through the testimony of Angelo Savardi, one of the Benetton managers, that the only reasons the two men connected "Adiansi" with IMAF were that they had seen advertisements in Italy for Adiansi garments, and that they were familiar with the Italian knitwear manufacturing industry. Tr. 30.

These facts concerning Mr. Savardi's basis of knowledge only became clear at trial after cross-examination. It would appear that if they had been elicited earlier, plaintiff's claims might not have reached the trial stage. As Judge Wood pointed out in her opinion, "[i]n determining whether secondary meaning has been acquired, the recognition by the *public* of the source of the product is of paramount significance." Opinion 5/12/89 at 7–8 (emphasis added). We further emphasized in our previous opinion that Mr. Savardi is clearly not an average consumer, and that his knowledge of the Italian knitwear industry caused him to recognize the Adiansi name. Opinion 11/10/92 at 13.

However, the fact that plaintiff managed to bring these claims to trial is of little relevance as a general principle. Attorneys' fees have been awarded to a defendant under § 1117(a) after a trial has been completed. *See, e.g., Mennen,* 565 F.Supp. at 657; *Diamond Supply Co.,* 589 F.Supp. at 476–77.

### B. The Trial

■ Once IMAF successfully reached the trial stage, three witnesses were produced to make the plaintiff's case. The testimony of Mr. Savardi failed to establish consumer confusion. The second witness, Sante Toscani, was an employee of Primavera at the time the 1985 order was filled. Mr. Toscani testified that "[a]s far as Primavera was concerned, the inspection was only from IMAF, not from [GBS]." Tr. 228. The court found this and other testimony offered by Mr. Toscani not to be credible, given the overwhelming evidence in the case that demonstrated Penney's control over the order.[4]

---

4. For example, Penney issued specifications for the sweaters, and retained the right to change

those specifications. Exh. 95. IMAF acknowl-

Finally, IMAF presented the testimony of Elio Adiansi. As this court explained in the prior opinion, it also did not find his testimony entirely credible. *See* Opinion 11/10/92 at 2 n. 4, 3 n. 3, 8–9. Although he may have strongly suspected that a conspiracy existed between Penney and Primavera, there was no proof at trial to support such a conclusion.

IMAF's case was troubled not only by witness credibility problems, but by legal insufficiencies as well. IMAF failed to prove consumer confusion or to present a survey of any kind that would help establish this element. As mentioned above, Mr. Savardi's testimony fell far short of doing so. IMAF could not establish consumer confusion because the Adiansi name had never been established in the United States. The company did not advertise the name "Adiansi" in the United States at all or sell garments in the United States bearing the Adiansi label. These sweaters in particular bore the Adiansi name but did not bear the IMAF name. This is not surprising: Penney was in control of the order at all times, as to the label on and the quality of the sweaters, because Penney would ultimately be the seller of the goods, and would be responsible in the eyes of the public for the quality of the goods.

Knowing that there was no other evidence that could be used to establish consumer confusion, there is no possible way that IMAF reasonably could have expected to succeed on a Lanham Act claim based on section 43(a). It is in part this absolute failure to make a sincere attempt validly to establish an essential element of a section 43(a) claim that raises a question as to IMAF's good faith.[5]

edged in at least one telex to Penney that Penney had ultimate quality control. Exh. R.

5. IMAF compares this case with *Viola Sportswear v. Mimun,* 574 F.Supp. 619 (1983), and argues that whereas in that case the suit was brought because of a single pair of jeans, here a great deal more is at issue—both economically and as to reputation. As to the former, however, IMAF would have lost money had the contract gone as planned. *See supra* note 2. As to the latter, there was no damage to the IMAF name because the name never appeared on the

## CONCLUSION

Penney was forced to incur expenses and devote time to defend against a lawsuit that continued for six years and utterly lacked a solid legal foundation. Penney has requested and submitted proof of expenses totalling $22,747.90. This amount includes $12,182.40 for attorneys' fees, and $10,565.50 for costs incurred in the course of litigation. Costs are awarded to Penney as the prevailing party. Under section 35 of the Lanham Act, attorneys' fees may be awarded to the defendant, the amount being in the discretion of the court.[6] Twelve thousand dollars is eminently fair and reasonable. Thus, because the court finds the requested amount—i.e., $22,747.90—to be appropriate, Penney is hereby awarded said amount as costs and attorneys' fees, to be imposed jointly and severally against IMAF and its attorney.

Submit order in conformity herewith.

SO ORDERED.

sweaters. There was no damage to the Adiansi name because no consumers in this country would have associated it with plaintiff.

6. *See Viola Sportswear,* 574 F.Supp. at 621. The court in *Viola Sportswear* imposed a $20,000.00 award, to be paid by the plaintiff and attorney jointly and severally. *See id.* (citing *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379 (2d Cir.1982) (*Potamkin I*); 697 F.2d 491 (2d Cir.1983) (*Potamkin II*)).