**UNIVERSAL CITY STUDIOS, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**NINTENDO CO., LTD. and Nintendo of America, Inc., Defendants-Appellees, Cross-Appellants.**

**Nos. 1221, 1335, Dockets 86–7077, 86–7099.**

United States Court of Appeals, Second Circuit.

Argued June 16, 1986.

Decided July 15, 1986.

Michael W. Schwartz, Wachtell, Lipton, Rosen & Katz, New York City (David Gruenstein and Richard H. Weiss, of counsel), for plaintiff-appellant, cross-appellee.

John J. Kirby, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City (Thomas G. Gallatin, Jr., Shelley B. O'Neill and Robert J. Gunther, Jr., of counsel), for defendants-appellees, cross-appellants.

Before MESKILL and KEARSE, Circuit Judges, and METZNER, District Judge.*

METZNER, District Judge:

This is an appeal from a judgment, entered after a bench trial, of the United States District Court for the Southern District of New York, Sweet, J. The judgment disposed of counterclaims brought by the defendants, Nintendo Co., Ltd. and Nintendo of America, Inc. (Nintendo), against plaintiff Universal City Studios, Inc. (Universal), a subsidiary of MCA, Inc. We affirm.

## BACKGROUND

This case represents the latest round involving the allegation that Nintendo infringed Universal's trademark in King Kong when it marketed its popular video game Donkey Kong. Judge Sweet decided in 1983, on motions for summary judgment, to dismiss Universal's complaint of trademark infringement and unfair competition against Nintendo. *Universal City Studios v. Nintendo Co.*, 578 F.Supp. 911 (S.D.N.Y. 1983). This court affirmed that judgment.

*Universal Studios v. Nintendo Co.*, 746 F.2d 112 (2d Cir.1984).

The district court then proceeded to try Nintendo's counterclaims against Universal. On July 29, 1985, the district court ruled for Nintendo on part of its tortious interference counterclaim; for Nintendo on its vicarious copyright infringement counterclaim; and against Nintendo on its unjust enrichment counterclaim. *Universal City Studios v. Nintendo Co.*, 615 F.Supp. 838 (S.D.N.Y.1985). The court also awarded Nintendo punitive damages for tortious interference, attorney's fees for successfully defending against Universal's trademark infringement claim, and attorney's fees for successfully prosecuting its vicarious copyright infringement counterclaim. Each party now appeals to this court on each of the claims it lost below.

The dispute between Universal and Nintendo first arose when Donkey Kong became enormously popular in 1981 and 1982. The game was played by millions of Americans, including some of the top management at Universal, who concluded that it reminded them of King Kong. Universal had been greatly interested in the original 1933 "King Kong" movie, a "Son of Kong" sequel, and a 1976 remake of the original.

In 1975 a dispute had developed between Universal, RKO Radio Pictures, Inc. (RKO), and the Dino DiLaurentis Corporation (DDL), as to who could produce a remake of the film "King Kong." RKO had produced the original film in 1933, which was based upon a book by Merian C. Cooper, who also co-authored the screenplay. In 1975, RKO licensed DDL to produce a remake, a result that upset Universal, which claimed that it had been offered the license in negotiations.

In August 1975 Universal filed suit in federal court for the Central District of California seeking a declaratory judgment that the copyright on the King Kong story had lapsed, that the story was in the public domain, and that Universal could produce a

---

* The Honorable Charles M. Metzner of the United States District Court for the Southern District of New York, sitting by designation.

remake without infringing the rights of RKO or DDL. *Universal City Studios, Inc. v. RKO General Inc., et al.*, C.V. 75–3526–R (C.D.Cal.1975). RKO counterclaimed asserting, among other things, that Universal had diluted its trademark in King Kong. At the conclusion of a four-day bench trial, Universal's regular outside trial counsel, Stephen Kroft, argued that King Kong could not be a trademark because it had no secondary meaning and was part of the ordinary English language.

On November 24, 1976, the district court found that the King Kong story, as embodied in the original novel, had become part of the public domain, and that RKO had a copyright only in "the copyrightable matter" which was contained in the 1933 movie but not in the original novel. *Universal City Studios, Inc. v. RKO General, Inc., et al.*, C.V. 75–3526–R (C.D.Cal. Nov. 24, 1976) (Findings of Fact and Conclusions of Law). The court found that Universal could make a movie based on King Kong as long as it did not infringe on the copyrightable scenes of the 1933 movie. *Id.*

The court denied relief on RKO's counterclaim alleging trademark dilution, adopting Universal's argument that there had been no such dilution and, further, that:

"1) There is no evidence that the title 'King Kong' has a secondary meaning by which the public [in 1976] indentifies such title with RKO or the motion picture.

2) The name 'King Kong' has become part of the ordinary English language."

*Id.* The court reduced these findings to a judgment (the RKO judgment) [1] on November 24, 1976.

Richard Cooper, Merian's heir, was a defendant in the RKO litigation and had filed a cross-claim against RKO. On December 6, 1976, the court entered an interlocutory judgment which determined that Merian Cooper's agreement with RKO had given RKO the right only to produce the 1933 movie and the "Son of Kong" sequel. *Richard Cooper v. RKO General, Inc.*, C.V. 75–3526–R (C.D.Cal. Dec. 6, 1976).

The district court later entered findings of fact and conclusions of law in conjunction with a final judgment (the Cooper judgment) on Richard Cooper's cross-claim. The court incorporated its previous findings from the interlocutory judgment and concluded that, *as between RKO and Cooper*, Cooper possessed all rights in the name, character and story of King Kong other than the rights in the 1933 movie and the sequel "Son of Kong." The court also found that RKO's license with DDL for the remake of King Kong, and its licenses with certain toy manufacturers, had breached RKO's original limited assignment from Merian Cooper. Therefore, RKO owed Richard Cooper the profits accrued from these breaches. The court consistently noted, however, that its determination of Richard Cooper's cross-claim did not affect any other person and did not affect its finding that the King Kong story was in the public domain.

It is clear from the above that Cooper did not hold any trademark rights against the world in King Kong. Any such rights that might exist would be solely against RKO.

After the entry of the Cooper judgment, Cooper assigned all of his rights in King Kong to Universal for $200,000. The primary value of the assignment, it appears, was Cooper's right to receive certain revenues DDL would pay to RKO under DDL's license to produce a King Kong remake. DDL released that remake in December 1976.

In the years following the RKO case, Universal made no effort to license King Kong. In 1981, however, O.R. Rissman, the president of Tiger Electronics Toys, Inc. (Tiger), saw a new Donkey Kong video

1. RKO appealed the RKO judgment to the Ninth Circuit Court of Appeals, and Universal, in its brief to that court, argued that "[t]he name, title and character of 'King Kong' are in the public domain." Brief for Appellee, *Universal City Studios, Inc. v. RKO General, Inc., et al.*, Nos. 77– 1518, 77–2212, at 76. Before the Ninth Circuit ruled, Universal and RKO entered into a settlement agreement. As part of the settlement, the parties agreed that the RKO judgment below would be vacated.

arcade game in Japan, and decided that Tiger should produce a similar game. In September 1981 he received from Universal an exclusive King Kong license for video games.

In the summer and fall of 1981, Nintendo filed applications for a copyright and trademark for Donkey Kong and began to market the game in the United States. Nintendo also reached an agreement with Coleco Industries, Inc. (Coleco), which provided that Coleco would produce Donkey Kong in cartridge form for use with a home video game it was beginning to market. Nintendo reached similar agreements with other third parties, including Atari, which agreed to market a similar video cartridge, and with Ruby-Spears, which received an option to use the Donkey Kong name and character in a cartoon series.

In the spring of 1982 Universal began to assert that it had trademark rights in King Kong which were being infringed by Donkey Kong. In April 1982 Universal asserted to Coleco and Nintendo that their cartridge infringed Universal's rights in King Kong. Coleco promptly agreed to settle and to pay Universal 3 per cent of its profits from Donkey Kong sales. Nintendo refused to settle, however.

At about this same time Universal took action to revoke its license with Tiger, apparently because that license contained an exclusivity provision which would prevent Universal from granting a license to Coleco. Universal first terminated Tiger's license, but after Nintendo remained adamant in refusing to settle, Universal advised Tiger that it would reconsider terminating its license if Tiger made some modifications to its game. Tiger then made some minor alterations, and Universal granted a modified license which included a nonexclusivity provision.

On June 29, 1982, Universal filed suit against Nintendo in the Southern District of New York, using the local law firm of Townley & Updike as counsel. In the fall and winter of 1982 Universal moved aggressively to persuade Nintendo's Donkey Kong licensees to establish license agreements with Universal. Universal reached an agreement with Atari which provided that Universal would not sue Atari, and that Atari would pay Universal 3 per cent of the gross wholesale sales of Atari's Donkey Kong cartridges. Universal also reached a similar agreement with Ruby-Spears.

On January 3, 1983, Universal sent "cease and desist" letters to all of Nintendo's licensees restating the claims in Universal's complaint. (Universal had obtained the list of licensees in discovery in its suit against Nintendo.) Universal demanded that each licensee either cease marketing Donkey Kong products or obtain a license from Universal.

During this period Universal aggressively sought to persuade Nintendo's two other major licensees, Milton Bradley (which had a Donkey Kong board game), and Ralston-Purina (which had a license for a Donkey Kong cereal), to obtain licenses from Universal. Both companies refused, and both marketed their products without legal action by Universal.

The facts described above have given rise to three Nintendo counterclaims alleging liability. Nintendo claims first that Universal's "cease and desist" letters threatening litigation against Nintendo's third party licensees tortiously interfered with Nintendo's contractual relations with those licensees. Second, Nintendo claims that Universal's modified agreement licensing Tiger's King Kong video game vicariously infringed Nintendo's copyright in Donkey Kong. Third, Nintendo contends that Universal's agreements with Coleco, Atari and Ruby-Spears tortiously interfered with Nintendo's agreements with those three companies and resulted in unjust enrichment.

## DISCUSSION

I. *Universal's "Cease and Desist" Letters to Nintendo Licensees*

■ The district court found that Universal tortiously interfered with Nintendo's contractual relations when it sent "cease

and desist" letters to Donkey Kong licensees on January 3, 1983. The district court found that, as the result of these letters, six licensees[2] stopped manufacturing Donkey Kong products and refused to pay to Nintendo the guaranteed royalties specified in their licenses. This resulted in damages of $94,219.56, which the district court awarded to Nintendo.

To establish a claim for tortious interference with contractual relations under New York law (which the parties agree is applicable), Nintendo must establish: (1) a valid contract between Nintendo and a licensee; (2) Universal's knowledge of the contract and inducement of a breach; and (3) resulting damage to Nintendo. *Strobl v. New York Mercantile Exchange*, 561 F.Supp. 379, 386 (S.D.N.Y.1983); *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y. S.2d 1, 5, 134 N.E.2d 97, 99 (1956).

Universal mounts on appeal a two-pronged attack against the district court's finding. First it argues that the threat of litigation, without anything more, cannot amount to tortious interference with contractual relations. Second, it asserts that the district court's findings were clearly erroneous.

At the outset, it is clear that under New York law litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations. When the New York Court of Appeals considered the basis for this tort in 1980, it described the nature of the action and included civil suits among the "wrongful means" that could give rise to liability. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S. 2d 628, 632, 406 N.E.2d 445, 448 (1980). Further, the *Guard-Life* decision expressly endorsed the provisions in the *Restatement*

*(Second) of Torts* establishing this tort. *Id.* Under the *Restatement*, a lawsuit or the threat of a lawsuit is wrongful "if the actor has no belief in the merit of the litigation." *Restatement, supra*, § 767, comment c. It is also wrongful if the actor, having some belief in the merit of the suit, "nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." *Id.* See also *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 677–78 (2d Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

The question here is whether the district court's findings in this case were clearly erroneous. Fed.R.Civ.P. 52(a). As this court has stated so often, this means that we must not disturb the findings below unless "we are 'left with the definite and firm conviction that a mistake has been committed.'" *Avis Rent a Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 384 (2d Cir.1986), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). The court below found that Universal knew that it did not have a trademark in King Kong, and that it threatened suit not to adjudicate its trademark claim, but to coerce others into sharing their Donkey Kong profits.

Judge Sweet was fully justified in finding on the record of this case, that Universal did not have a good faith basis for its conduct. In assessing this case, we return to the 1975 litigation against RKO in which Universal successfully urged that the name King Kong had not acquired any secondary meaning. If anyone knew what the law was on this point under the facts of this case, it was Universal.[3]

---

2. These licensees were Trim Line, Charlestan Hosiery, Super Shirts, House Glass, Mantan Cork and Sylva Manufacturing.

3. The fact that the parties in the RKO suit subsequently settled their dispute and vacated the district court's judgment does not alter the underlying fact that Universal's contention of law was approved by a federal court. The holding in this case involves not an application of judicial estoppel, which would completely bar the party from arguing an inconsistent position in subsequent litigation, *see Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167 (4th Cir.1982), but only an inference as to the party's belief in the merits of its subsequent lawsuit.

Of course, there may be a legitimate explanation for an about-face, such as new law or changed circumstances, among others. However, Universal offered no explanation for its change in position, and in fact completely ignored the fact that it reversed course.

There was sufficient other evidence to buttress the decision below.

First, it was clear from the evidence that Sidney Sheinberg, president of Universal and MCA and also an attorney, personally knew the facts, background and nuances of the 1975 litigation. He stated that the 1975 case was his case and there was no intermediary. He knew that RKO and DDL owned copyrights in the verbatim visual images from the 1933 and 1976 movies. The evidence unequivocally indicated that Sheinberg and Joseph Di Muro, a legal consultant and former general counsel of Universal, both repeatedly concluded that Universal could not copy the verbatim movie images of the King Kong gorilla because RKO and DDL owned those images.

Sheinberg must have known that these RKO and DDL visual image rights were irreconcilable with the existence of any universal trademark rights in King Kong. Under the Lanham Act:

"The term 'trade-mark' includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."

15 U.S.C. § 1127. The existence of the legally protected RKO and DDL King Kong images meant that the public could not possibly associate some undefined third King Kong image and distinguish it from these other sources. In this regard it is noteworthy that Universal never created another image of King Kong.

Further, in depositions, Sheinberg either refused or was unable to identify the nature of Universal's rights in King Kong, an indication that Sheinberg did not believe in the assertion made in Universal's complaint and letters. Also consistent with such a lack of belief was Universal's less than vigorous efforts to enforce any trademark rights it thought it possessed. Before Donkey Kong was marketed, Universal did nothing to protect any rights in King Kong when trademark searches indicated third party uses of the name. Finally, this failure to act is consistent with the fact that Di Muro and Loretta Sifuentes, a lawyer and vice president of MCA, concluded that Universal had no rights to license King Kong.

Even in conjunction with Donkey Kong, Universal simply threatened legal action against numerous third party licensees of Donkey Kong, and then invited them to quickly settle their disputes. When licensees such as Coleco and Atari agreed to settle, Universal obtained handsome royalties. When other licensees refused to settle, however, Universal did not pursue its claims by filing actions in court. This further indicates that Universal used litigation and the threat of litigation merely to obtain quick settlement payments from third parties, and not to bring its claims to definitive adjudication.

Universal seeks to rebut this wide array of evidence by arguing that Cooper received in the Cooper Judgment, and then transferred to Universal, trademark rights that had been held by RKO. Perhaps Cooper did receive and transfer some undefined "merchandising rights," but Cooper plainly did not obtain any trademark rights in his judgment against RKO, since the California district court specifically found that King Kong had no secondary meaning.

Universal seeks nonetheless to avoid liability by asserting that it relied on the opinion of outside counsel Steven Kroft that it had a valid claim. Under the *Restatement*, a party is not liable in tort for threatening legal action if it relied upon the advice of counsel, sought in good faith, after full disclosure of all relevant facts within its knowledge and information. *Restatement*, § 675.

In this case, Universal failed to call Kroft as a witness at trial. The district court "inferred from the absence of Kroft's testimony and his continuing close relation-

ship with Universal that, had he testified, his testimony would have been unfavorable to Universal on the subject of its trademark claim." 615 F.Supp. at 847. Given Kroft's position in the RKO litigation that King Kong had no secondary meaning, and the fact that Kroft, as a witness, was essentially under Universal's control, it is reasonable to infer that Kroft's testimony would not have supported Universal. Indeed, it would have been interesting to hear him explain the consistency of any advice to Universal that it had trademark rights with his statements to the California district court on this point.

*The Award of Attorney's Fees*

■ The district court awarded Nintendo $1,142,545.70 for the attorney's fees incurred in defending Universal's trademark infringement and unfair competition claims. It found that this award was proper under Section 35 of the Lanham Act, or alternatively, as punitive damages on the tortious interference claim or pursuant to Rule 11 of the Federal Rules of Civil Procedure.

The district court's award of attorney's fees in this case was appropriate under Section 35 of the Lanham Act. 15 U.S.C. § 1117. This section states that "[t]he court in exceptional cases may award reasonable attorney's fees to the prevailing party."

The district court did not err when it found that Universal brought its Lanham Act claim in bad faith merely to join in the profits from Donkey Kong. It then based its award of attorney's fees in this case on *Mennen Co. v. Gillette Co.*, 565 F.Supp. 648 (S.D.N.Y.1983), *aff'd mem.*, 742 F.2d 1437 (2d Cir.1984). In *Mennen*, a district court awarded counsel fees to a defendant which had successfully defended against trademark and unfair competition claims because:

> "There is a substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy. As such it carries necessary damage to the defendant when the plaintiff's claims

are found, as they are here, to have no real substance."

565 F.Supp. at 657.

The *Mennen* approach is consistent with that taken by other courts which have considered the attorney's fee issue by focusing on whether a losing party prosecuted or defended a claim in bad faith. *South Whisky Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 813–14 (7th Cir.1973); *DC Comics, Inc. v. Filmation Associates*, 486 F.Supp. 1273, 1284 (S.D.N.Y.1980); *Steak & Brew, Inc. v. Beef & Brew Restaurant, Inc.*, 370 F.Supp. 1030, 1038 (S.D.Ill.1974).

Given this conclusion, there is no need for this court to determine whether an award of attorney's fees was justified as punitive damages or pursuant to Rule 11 of the Federal Rules of Civil Procedure.

*The Award of Punitive Damages*

■ The district court also awarded $222,498.28 as punitive damages on Nintendo's tortious interference counter-claim. This amount represented funds which Nintendo disbursed in defending against Universal's Lanham Act claim, but which were not spent on attorney's fees and which were not taxable as costs under Civil Rule 11 of the Rules of the Southern District of New York.

Under New York law, an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights. *Giblin v. Murphy*, 97 A.D.2d 668, 671, 469 N.Y.S.2d 211, 215 (3d Dept.1983); *Le Mistral, Inc. v. Columbia Broadcasting System*, 61 A.D.2d 491, 494–95, 402 N.Y.S.2d 815, 817 (1st Dept.1978), *appeal dismissed*, 46 N.Y.2d 940 (1979). The New York courts have considered punitive damages to be particularly appropriate for tortious conduct involving deliberate action "systematically conducted for profit." *See Walker v. Sheldon*, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497, 499 (1961).

An award of punitive damages was appropriate under the facts of this case. First, Universal knew that it did not have

trademark rights in King Kong, yet it proceeded to broadly assert such rights anyway. This amounted to a wanton and reckless disregard of Nintendo's rights.

Second, Universal did not stop after it asserted its rights to Nintendo. It embarked on a deliberate, systematic campaign to coerce all of Nintendo's third party licensees to either stop marketing Donkey Kong products or pay Universal royalties.

Finally, Universal's conduct amounted to an abuse of judicial processes, and in that sense caused a larger harm to the public as a whole. Depending on the commercial results, Universal alternatively argued to the courts, first, that King Kong was part of the public domain, and then second, that King Kong was not part of the public domain, and that Universal possessed exclusive trademark rights in it. Universal's assertions in court were based not on any good faith belief in their truth, but on the mistaken belief that it could use the courts to turn a profit.

Based on these facts the district court's award of punitive damages was not an abuse of discretion.

## II. *Universal's License of Tiger's King Kong Video Game*

■ The district court found that Universal vicariously infringed Nintendo's copyright in Donkey Kong by licensing the competing King Kong game made by Tiger. The court found that Universal knowingly contributed to this infringement, and awarded Nintendo the profits Universal accrued on the Tiger license, totaling $56,689.41.

On appeal, Universal argues that the district court erred by failing to specify which part of Nintendo's arcade game represented protectible expression as distinguished from the underlying and unprotectible idea. Further, Universal argues that the characters involved in Donkey Kong are not protectible because they are not "wholly fanciful."

The district court specified the protectible aspect of Donkey Kong with reasonable precision. It recognized that the game characters themselves were not protectible, but found that the "interaction" of the characters, obstacles, background and music were "arbitrary, fanciful, and sufficiently distinctive such that they deserve protection...." 615 F.Supp. at 859–60.

The district court's finding is further buttressed by Universal's initial termination of the Tiger license and the admission to Nintendo by Robert Hadl, a vice president of Universal, that Universal recognized that the Tiger game infringed Nintendo's copyright in Donkey Kong.

■ The district court also awarded attorney's fees of $83,525.05 to Nintendo for the time spent on the vicarious copyright infringement claim. 615 F.Supp. at 864. Universal appeals from this award.

The district court awarded attorney's fees pursuant to 17 U.S.C. § 505 which provides that "[t]he court in its discretion ... may award a reasonable attorney's fee to the prevailing party." This circuit has long held that such an award lies within the sound discretion of the trial court. *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 122 (2d Cir.), *cert. denied*, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

Given the findings noted above, an award of attorney's fees was well within the district court's discretion. *Roth v. Pritikin*, 787 F.2d 54, 57 (2d Cir.1986); *see also Diamond v. Am-Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984).

## III. *Universal's License Agreements with Coleco, Atari and Ruby-Spears*

■ The district court rejected Nintendo's counterclaims seeking damages on the basis of Universal's license agreements with Coleco, Atari and Ruby-Spears. Nintendo contends that it is entitled to relief on the ground, first, that Universal tortiously interfered with Nintendo's license agreements with these three companies (the Nintendo Agreements), and second,

that Universal's action resulted in unjust enrichment.

As to tortious interference, there is no evidence to indicate that the Nintendo Agreements were materially breached. Universal's actions did not in any way reduce the payment of royalties to Nintendo. Further, the fact that these licensees entered into agreements with Universal, by itself, does not establish a breach of the Nintendo Agreements because those agreements permitted the licensees to settle any infringement actions brought against them.

■ In the counterclaim for unjust enrichment, Nintendo alleges that Universal misappropriated Nintendo's trademark in Donkey Kong when it licensed King Kong in agreements with Coleco, Atari and Ruby-Spears. Nintendo argues that it is entitled to recover the $4.76 million in revenue that Universal earned from these agreements because, in substance, Universal licensed not King Kong, but rather Nintendo's rights to Donkey Kong.

To recover on a theory of unjust enrichment under New York law, a party must establish not only that there was enrichment, but that the enrichment was at the plaintiff's expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff. *Dolmetta v. Uintah National Corp.*, 712 F.2d 15, 20 (2d Cir.1983); *see also McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 606, 363 N.E.2d 328, 330 (1977). A circuit court's review of an unjust enrichment determination is limited. "The granting of equitable relief lies within the sound discretion of the trial court, so long as that discretion is exercised in accordance with the applicable established precedents." *Indyk v. Habib Bank Limited*, 694 F.2d 54, 57 (2d Cir.1982).

Nintendo sold its rights in Donkey Kong to Coleco, Atari and Ruby-Spears when it entered into license agreements with these three companies. Thus, on the face of the transactions involved in this case, Universal did not obtain money that was owed to Nintendo.

This is not to say that Universal acted properly when it entered into these three license agreements. Any injustice harmed not Nintendo, however, but the three companies that paid Universal. Equity requires, therefore, that if Universal must disgorge its profits, the money should be paid to these companies. Coleco has already sued Universal to recover the revenues it paid. *Coleco Industries, Inc. v. Universal City Studios, Inc.*, 84 Civ. 2596 (S.D.N.Y. filed April 12, 1984). That case, not this one, represents the proper means to determine the propriety of Universal's conduct.

The judgment of the district court is affirmed.