**INTERNATIONAL MINERALS AND RE-SOURCES, INC., International Shipping Company, S.A., and Lygren Maritime Services, S.A., Plaintiffs,**

v.

**T. Peter PAPPAS, Bomar Resources, Inc., American General Resources, Inc., Richard Jaross, and A.L. Burbank Shipbrokers, Ltd., Defendants,**

**and**

**Atle Lygren, Additional Defendant on Counterclaim.**

No. 87 Civ. 3988 (PKL).

United States District Court, S.D. New York.

April 19, 1991.

Gold & Wachtel, New York City (Robert Gold, Elliot Silverman, of counsel), for plaintiffs.

Haight, Gardner, Poor & Havens, New York City (Stephen K. Carr, Donald J. Kennedy, Alan Heblack, of counsel), for defendants American General Resources, Inc. and Richard Jaross.

### OPINION AND ORDER

LEISURE, District Judge.

This case involves allegations of tortious interference with an alleged contract to purchase a distressed vessel, the M/V Brazilian Friendship (the "Friendship" or "the

ship"), and its cargo. Defendants American General Resources, Inc. ("AGR"), and Richard Jaross ("Jaross") have moved for summary judgment dismissing the amended complaint as against them and granting AGR judgment on its counterclaim against plaintiffs and against additional defendant on the counterclaim, Atle Lygren ("Lygren"); or, in the alternative, for partial summary judgment dismissing certain damages claimed by plaintiffs.

## BACKGROUND

The claims asserted in this lawsuit derive from the confused events surrounding various parties' attempts to purchase the Brazilian Friendship. All of the parties in this action have some involvement in the business of investing in ships, whether as brokers, principals, or scrappers of distressed vessels. The moving defendants are AGR, a corporation formed under the laws of Texas, and Jaross, vice president and treasurer of AGR (collectively, the "moving defendants"). AGR is engaged in the business of buying, selling, salvaging, repairing and scrapping vessels. By written agreement dated June 30, 1986, AGR contracted to locate scrap and distressed vessels for defendant Bomar Resources, Inc. ("Bomar"), a trader in such vessels. Defendant A.L. Burbank ("Burbank") is a shipbroker that has frequently acted as broker for AGR and Bomar in ship acquisitions.

Counterclaim defendant Lygren is a Norwegian citizen and Swiss resident with extensive experience as a shipbroker. He claims that since the fall of 1986 he has acted primarily on behalf of plaintiff International Minerals and Resources, Inc. ("IMR"), as a principal. IMR is a corporation organized under the laws of Liberia and formed at the request of Lygren, who manages its affairs under a power of attorney. IMR is engaged in the business of investing in ships and in transporting bulk cargoes by sea.

Plaintiff International Shipping Company, S.A. ("ISC"), is a corporation formed under the laws of Panama and a wholly owned subsidiary of IMR, acquired for the purpose of taking title to the Friendship. ISC is managed by Lygren under a power of attorney. Plaintiff Lygren Maritime Services ("LMS") is a Swiss corporation, of which Lygren is principal shareholder, president and chief executive officer. Until at least the latter part of 1985, LMS acted primarily as a broker in the sale and purchase of second-hand vessels, negotiating shipbuilding and transportation contracts, and financing ships.

In November 1985, the Friendship ran aground in the Orinoco River in Venezuela, while carrying a cargo of some 64,000 metric tons of iron ore. The ship and its cargo were the subject of considerable international interest by those involved in the purchase and sale of distressed vessels, for salvage, scrap or restoration. Among those interested in the ship's availability were the plaintiffs and defendants in this action. Title to the vessel was not clear until April 1987, when it passed to a local salvage company in Venezuela, which nominated Hydra Offshore Ltd. ("Hydra") to take title to the vessel.

The parties do not dispute that Lygren and Jaross spoke on or about November 17 or 18, 1986, concerning a plan whereby AGR, Lygren and defendant Bomar would acquire the vessel and tow it to a Romanian shipyard, where the cargo of iron ore would be traded for the cost of repairs. Lygren informed the moving defendants that he had extensive connections in Romania and could secure a good price for the ore. Plaintiffs characterize the plan as a proposed joint venture, to which defendants never committed. The moving defendants assert that Lygren agreed to act as their broker.

After November 17, 1986, Jaross sent certain information to Lygren concerning the Friendship. The moving defendants claim that the information was confidential and that Lygren wrongfully passed it on to others, while plaintiffs claim that it was

generally available in the market. During November and December 1986, Lygren sent a series of telex and telefax communications to Jaross concerning the Romanian aspect of the proposed Friendship acquisition. See DX 22–28.[1]

Lygren and Jaross also discussed a number of other vessels then available in the market. The moving defendants claim, and plaintiffs deny, that Lygren was acting as AGR's broker for those vessels. However, Lygren admits that, in January 1987, he acted as AGR's broker during a trip to Moscow that did not involve the Friendship.

In early January 1987, Jaross visited Lygren's home in Switzerland; the parties dispute whether the Friendship was a subject of discussion. Lygren declares that during that visit, he concluded that the joint venture would never go forward, because of Jaross's personal, legal and financial problems. Later that month, Lygren received a repair quote from the Romanian shipyard and submitted a bid for the ship on behalf of either IMR or ISC,[2] which was met by a counteroffer. See PX 43–45. Lygren admittedly did not inform AGR or Jaross of either the repair quote or the bid.

Lygren again submitted bids in April 1987, after legal title to the ship had been resolved. See PX 50–53. On April 23, 1987, certain terms apparently were agreed to by Hydra and IMR,[3] including a purchase price of $2,650,000. The terms were summarized in a telex that stated that they were subject to approval by IMR's board of directors and the signing of a formal Memorandum of Agreement (the "Agreement").

See DX 34 ¶¶ 2, 7. The telex also provided: "Contract to be based on NSF 83 suitably ammended [sic]. Contract shall be in accordance with standard S and P terms with logical ammendments [sic] for this specific transaction...." Id. ¶ 9. Payment of a ten percent deposit was to be made either "upon signing contract or all subjects lifted, whichever is later." Id. ¶ 2. Buyers were to be entitled to nominate a delivery date and to place representatives on board the vessel "once contract signed and deposit lodged." Id. ¶¶ 4, 6.

On May 15, Lygren, acting through his power of attorney, lifted the "subject to approval" condition. See DX 35. Plaintiffs contend that a valid contract existed as of April 23, or, alternatively, as of May 15. However, the May 15 telex included requests for a draft of the Agreement "for buyers [sic] review and comments" and for further information regarding such things as the identity of the registered owners and whether the insurers had taken title to the ship and paid all claims, liens and mortgages. See DX 34, 35.

On May 15, 1987, Jaross was informed by Nicholas Reisini, Lygren's partner at LMS, that Lygren had bought the Friendship. Jaross then sent a telex to Lygren, expressing both his understanding that Lygren had been acting as AGR's broker for the vessel and his surprise at Lygren's actions. See DX 37. On May 18, Lygren sent a telex to Jaross denying that he and Reisini had purchased the vessel. See DX 38.

From this point, if not earlier,[4] Burbank acted as AGR's broker, and bid for the

---

1. References to "PX" and "DX" are to exhibits submitted by plaintiffs and moving defendants, respectively, with their motion papers. "PX" identifies "Exhibits to the Affidavit of Robert Gold Sworn to on March 23, 1990"; "DX" identifies exhibits listed in the moving defendants' "Index of Exhibits."

2. The moving defendants assert that the bid was made on behalf of ISC; plaintiffs, that it was on behalf of IMR. The documentary evidence is inconclusive regarding these early bids, but it is clear that the later April 23 bid was on behalf of IMR or its nominee as buyer. See note 3, infra.

3. A follow-up telex sent to EWS by Lygren on April 23 states that the buyer is "International Minerals and Resources Inc. or nominee." PX 5. ISC apparently was nominated as buyer by IMR on May 19. See PX 6. The formal Memorandum of Agreement executed on May 25, 1987, was between Hydra and ISC. See DX 45.

4. Jaross testified at his deposition that Burbank was at all times his broker for purchase of the Friendship, while Lygren was his broker for the

Friendship on behalf of AGR and Bomar. On May 18, Burbank sent a telex to Hydra's London broker, English White Shipping, Ltd. ("EWS"), asking it to advise whether the ship was sold, and stating that Burbank had a buyer willing to offer $2.8 million. *See* DX 39. On the same day, EWS responded by telex: "Tks tlx but would confirm vsl now def sold [sic]." DX 40.

Burbank submitted AGR's bid of $2.8 million to EWS on May 22, stating that it understood that "the party to whom the [vessel] was previously committed has not lodged a deposit." DX 41.

Shortly thereafter, Jaross raised his bid to $2,925,000, and sent that bid directly to Hydra in Venezuela, as well as to EWS in London. *See* DX 42, 43. On May 24, Jaross spoke to James Gosling ("Gosling"), Hydra's London solicitor, who said that he was unsure whether a Memorandum of Agreement had been signed or was to be signed the following day.

Throughout the day of May 25, 1987, Lygren admittedly continued to negotiate terms of the Agreement, which was signed that evening. *See* DX 44, 45. Late that evening, London time, Carla de Calderan ("de Calderan"), the President of Hydra, placed a call from Venezuela to Jaross in London. The moving defendants contend, and plaintiffs deny, that de Calderan told Jaross that the Friendship was still available, and that she had never received AGR's May 18 bid.

The next day, Jaross told Burbank to send copies of the May 18 bid to de Calderan in Venezuela. On May 27, Jaross spoke to his New York counsel, Richard Jarashow ("Jarashow"), who referred him to London counsel, P.T. O'Neill ("O'Neill"). O'Neill has stated under oath that he advised Jaross that if a contract had been executed on the Friendship, Jaross should withdraw his bid. Affidavit of P.T. O'Neill, sworn to on Feb. 14, 1990, at 1. O'Neill then spoke to

ship's cargo and the Romanian deal. *See* DX 1, Deposition of Richard Jaross, held May 15,

Hydra's London attorney, Gosling, was told of the executed Agreement, and withdrew AGR's bid. *Id.* at 1–2. Jarashow had two conversations on May 27 with Brendan O'Sullivan, Hydra's Florida counsel, the content of which is disputed.

On May 28, 1987, Hydra notified ISC that it was cancelling the Agreement, purportedly because ISC had not timely deposited the requisite ten percent of the purchase price. *See* DX 48. On May 29, at Jarashow's request, Gosling sent him a telex confirming that the Friendship was available. *See* DX 49.

The events subsequent to the cancellation of the Agreement need not be stated in detail, for although hotly contested by the parties, they are not crucial to the Court's ruling today. It is apparent that Jaross contacted defendants Bomar and T. Peter Pappas ("Pappas") and informed them that the ship was available. Ultimately, a deal was arranged whereby the ship was purchased by Maryland Navigation Corporation ("Maryland"), a Liberian corporation wholly owned by Pappas, as nominee for Duke Petroleum Corporation, and a fee was paid to Bomar for "flipping" the deal to Pappas.

Meanwhile, ISC had commenced legal proceedings against Hydra in a London court. On June 1, the High Court of Justice, Queen's Bench Division, Commercial Court, issued an injunction enjoining Hydra and its agents from selling or delivering the Friendship to any party other than ISC. Although a written contract had apparently already been executed between Hydra and Maryland, the June 1 closing in Tampa, Florida, was adjourned after the parties received news of the injunction. However, Hydra maintained that the injunction had no extraterritorial application, and the closing was completed on June 2. The vessel was registered by Maryland with the Liberian Embassy on June 2.

Plaintiffs allege a continuing conspiracy among all the defendants to interfere with the Hydra–ISC contract and to "cover up"

1989, at 277.

their actions by, *inter alia,* backdating the delivery certificate.

On July 31, 1987, a British arbitration panel issued an Interim Final Award in which it found that Hydra's cancellation of its contract with ISC was unjustified, but which reserved the issue of remedies. PX 125. Plaintiffs have stated that they have not continued to prosecute the arbitration against Hydra because they have determined that any attempt to enforce a judgment against it would be futile. Hydra is not currently a party to the action before this Court.[5]

The moving defendants now move for summary judgment dismissal of the claims of plaintiffs IMR and LMS, for lack of standing, and of plaintiffs' claims of tortious interference for failure to state a claim. The moving defendants also move for summary judgment on their counterclaim that Lygren and plaintiffs breached their fiduciary duty as AGR's brokers on the Friendship. In the alternative, the moving defendants request partial summary judgment on the issue of damages.

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is appropriate if, 'after drawing all reasonable inferences in favor of the party against whom summary judgment is

sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property, etc.,* 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The substantive law governing the case[6] will identify the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex, supra,* 477 U.S. at

---

**5.** The action before this Court was commenced on June 8, 1987, by order to show cause seeking preliminary injunctive relief. The complaint was dismissed for lack of subject matter jurisdiction, because of the joinder of alien parties as both plaintiffs and defendants. The jurisdictional defect was cured on repleading by the elimination of Hydra as a defendant.

**6.** The briefs of both plaintiffs and moving defendants rely virtually exclusively on New York law. Under similar circumstances, the Second Circuit has stated that "we do not feel obliged to

undertake an investigation" into choice of law. *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 294 (2d Cir.1986) (Friendly, J.); *see also Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 n. 5, (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52–53 (2d Cir.1984) (parties may by acquiescence induce court to assume foreign law is similar to that of forum). Therefore, the Court will apply New York law to the substantive issues in this case.

323, 106 S.Ct. at 2553; *see also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, 106 S.Ct. at 2554.

Once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which "'must set forth facts showing that there is a genuine issue for trial.'" *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & H. Ry. v. Consolidated Rail Co.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).

## II. Standing

The moving defendants contend that neither IMR nor LMS has an independent claim against them, and asks the Court to dismiss their claims.

■ As the moving defendants point out, only ISC was a signatory to the May 25 Memorandum of Agreement, although preliminary negotiations were carried on by IMR, whose wholly owned subsidiary and nominee ISC became. The moving defendants assert that, as a separate corporate entity, IMR lacks standing to sue for alleged interference with a contract between ISC and Hydra. Plaintiffs assert that "the consistent practice in the shipping industry is for a parent corporation, as the real party in interest, to negotiate a contract, and then to designate a subsidiary as its 'nominee' to take title to the vessel at the time of closing." Plaintiffs' Memorandum of Law in Opposition ("Plain. Mem.") at 93. However, plaintiffs cite no authority on the question of standing or the legal effect of a nomination.

Despite plaintiffs' failure to brief this issue thoroughly, after viewing the record in the light most favorable to the nonmovant, the Court concludes that plaintiffs have made at least a minimal showing that IMR may have been a disclosed principal to the contract between Hydra and ISC, and therefore a real party in interest under Fed.R.Civ.P. 17(a). Accordingly, at this time the Court declines to dismiss IMR's claims for lack of standing.

■ The moving defendants also claim that, as a non-party to the Memorandum of Agreement, LMS lacks standing to sue. Plaintiffs' only response to this argument is that "as IMR's broker in this transaction, [LMS] is ... entitled to damages at least for its lost commissions." Plain. Mem. at 94. However, while there is evidence that LMS acted as IMR's broker, plaintiffs offer no authority for the proposition that lost commissions would entitle a broker to maintain an action for tortious interference. Plaintiffs make no argument and offer no proof that LMS was anything more than an incidental beneficiary of the Hydra–ISC contract. *Cf. Septembertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675 (2d Cir.1989); Restatement (Second) of Contracts § 302 (1981).

While New York courts have recognized the right of a third-party beneficiary to a contract to sue for tortious interference, no such right has been recognized for incidental beneficiaries. *See, e.g., Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 281, 413 N.Y.S.2d 309, 312, 385 N.E.2d 1238, 1241 (1978) ("There exists ... no tort liability to incidental beneficiaries not in privity."). The Court concludes that LMS lacks standing to assert a claim for tortious inference with another's contract, and that LMS's claims must therefore be dismissed.

## III. Tortious Interference

■ Under New York law, the elements of a claim for tortious interference with contractual relations are: "'(1) a valid contract between plaintiff and a third party

for a specific term; (2) defendant's knowledge of the contract; (3) defendant's intentional procuring of its breach; and (4) damages.'" *Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 446 (S.D.N.Y.1988), *aff'd*, 916 F.2d 820 (2d Cir. 1990) (quoting *Diehl & Sons, Inc. v. International Harvester Co.*, 445 F.Supp. 282, 291 (E.D.N.Y.1978)). Defendant's acts must have been the "but for" cause of the breach of contract. *Id.*

■ For a claim of interference with pre-contractual relations, a plaintiff must prove, in addition to the elements listed above, either (1) that defendant acted with exclusive malicious motivation, i.e., that defendant had no business or other motivation; or (2) that defendant employed "wrongful means" in interfering with the contract. *Id.* (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449 (1980)). These more stringent requirements reflect a policy according greater protection to "an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interests in a prospective relationship." *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d at 633. "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and 'some degrees of economic pressure.'" *Sharma, supra*, 699 F.Supp. at 446 (quoting *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d at 632, 406 N.E.2d at 449).

The moving defendants attack plaintiffs' claim on several grounds: (1) that plaintiffs should be estopped from arguing that a contract existed before May 25, 1987, by reason of Lygren's May 18 telex denying his purchase of the Friendship; (2) that plaintiffs have failed to plead and prove "but for" causation; and (3) that plaintiffs have failed to plead and prove knowledge, intent or improper interference on the part of defendants with respect to the May 25 contract, or the use of wrongful means in interfering with a prospective contract before May 25.

## A. Events Prior to May 25

■ The standard for determining whether, as of a particular date, a binding contract existed is an objective one, which turns on the intent of the parties. "Where parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement at issue, a factual question arises.... '[T]he objective manifestations of the intent of the parties as gathered by their expressed words and deeds' are the appropriate focus of inquiry." *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir.1989) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999 (1977)) (other citations omitted).

As the Second Circuit has stated, "New York follows the generally accepted rule that when parties negotiating a proposed contract express an agreement not to be bound until their negotiations have culminated in the execution of a formal contract, they cannot be bound until that event has occurred." *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1081 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990) (mailgram stating terms and referring to drawing up of "final papers" was not binding agreement).

In considering the legal effect of a preliminary agreement between contracting parties, courts in this Circuit have declared that "'[m]ore is needed than agreement on each detail [to create a binding obligation. There must be] overall agreement ... to enter into the binding contract.'" *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987)). Among the factors a court will consider are "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

The first factor, the language of the agreement, is the most important." *Id.* (citations omitted); *see also Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985). "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Teachers Ins., supra,* 670 F.Supp. at 499. Continuing negotiations between the parties subsequent to a preliminary agreement may also indicate the absence of intent to be bound. *See Bouton, supra,* 902 F.2d at 1076–77, 1080; *Winston, supra,* 777 F.2d at 82–83.

The agreement at issue here, the telex of April 23, contains no terms describing it as a binding agreement or expressing an intention by the parties to be bound as of that date, although it also lacks any express reservation of the right not to be bound. It is signed by neither party. It calls explicitly both for future approval by IMR's board of directors and for the preparation and execution of a formal memorandum of agreement. There is no evidence of partial performance until after the signing of the memorandum of agreement. While the lifting of board approval occurred on May 15, certain terms remained open to negotiation, and the final draft of the Agreement was not completed until May 25, the day of its signing.

The Court concludes from the language of the telex and from the continuing negotiations that the parties intended the negotiation and execution of a formal written instrument to be a prerequisite to their contractual obligations, and that no firm contract existed until May 25.

Moreover, even where a written letter of agreement has been found to be a contract binding upon its signatories, a claim for tortious interference will not lie if "[a] reasonably prudent person would not, in the circumstances, have assumed, as a matter of law, that there was a binding agreement." *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597, 608 (S.D.N.Y.1971). If an agreement "on its face would not appear to be binding,"

knowledge of a firm contract could not "fairly be imputed" even to one who knew about and had actually read the agreement." *Id.*

In this case, plaintiffs do not allege that defendants had seen the alleged contract of April 23 or of May 15 or knew any of its provisions; their primary evidence of defendants' knowledge is the May 18 telex from EWS stating that the ship had been sold. While a defendant need not know all the details of a contract to be liable for tortious interference, *see Gold Medal Farms, Inc. v. Rutland County Coop. Creamery, Inc.*, 9 A.D.2d 473, 195 N.Y. S.2d 179, 185 (3d Dep't 1959), it must have actual knowledge of a specific contract. Given Lygren's own explicit denial on May 18 that he had purchased the Friendship, knowledge of a firm contract involving Lygren or any of his companies can hardly be imputed to the moving defendants.

■ Furthermore, even if the contracting parties were bound as of April 23 or May 15, the Court agrees with the moving defendants that plaintiffs are estopped from asserting the existence of such a contract by reason of Lygren's telex. Plaintiffs attempt to maneuver around Lygren's denial by pointing out that Lygren merely said that he *and Reisini* had not bought the ship, and that the implication was left open that Lygren alone or that IMR rather then Lygren had bought the Friendship. The Court notes that such equivocation, if deliberate, might well amount to fraudulent misrepresentation. Plaintiffs are therefore estopped from first inducing the moving defendants to rely on Lygren's denial of a contract, and then suing them for interference with the very contract previously disavowed by plaintiffs' agent. *See, e.g., Robinson v. Pan American World Airways, Inc.*, 650 F.Supp. 125, 127 (S.D.N. Y.1986) (applying New York law).

Thus, any acts by the moving defendants prior to the evening of May 25, 1987, can only constitute, at most, interference with pre-contractual relations. Plaintiffs have not made, and cannot make, a showing of exclusive malicious motivation, since the moving defendants' economic motivation in

bidding for the Friendship is obvious. Moreover, as was the case in *Guard–Life*, there has been "no proof tendered of any wrongful means—persuasion and offer of better terms, yes; fraud, misrepresentation, threats, other wrongful conduct, no." *Guard–Life, supra,* 50 N.Y.2d at 196, 428 N.Y.S.2d at 636. An offer of better terms is not enough under this rule, and plaintiffs' conclusory allegations of fraud concerning the moving defendants' acts before May 25 are unsupported by the evidence. "[A]bsent a definite and existing contract, another party is free to compete...." *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 810 (S.D.N.Y.1980). Accordingly, defendants' motion for summary judgment on this issue is granted, and that portion of plaintiffs' claim for tortious interference based on the moving defendants' actions prior to May 25, 1987, is dismissed.

## B. Events Subsequent to May 25

■ Plaintiffs' evidence pertinent to the moving defendants' actions after May 25 includes, *inter alia,* that on May 24, Hydra's London counsel, Gosling, informed Jaross that the Agreement between Hydra and IMR had either been signed or would be signed the next day; that on May 25, the Memorandum of Agreement was executed; that on May 26, EWS told Jaross that the Friendship was not available; that Jaross nevertheless submitted a bid directly to de Calderan in Venezuela; and that not until May 29 did Gosling inform Jaross's New York counsel by telex that Hydra had cancelled the Agreement.

From this evidence alone, a jury could reasonably infer that the moving defendants had knowledge of the contract; that they intentionally procured its breach by making a higher offer; and that their actions were the "but for" cause of the breach, since there is no evidence that in the absence of the higher bid, Hydra would have cancelled the Agreement with IMR. *See, e.g., Sharma, supra,* 699 F.Supp. at 447; *Bryce v. Wilde,* 39 A.D.2d 291, 333

N.Y.S.2d 614 (3d Dep't), *aff'd,* 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972); *Gold Medal, supra,* 195 N.Y.S.2d at 185–86.

As to the events occurring after the May 28 cancellation of the contract, it is clear that plaintiffs have demonstrated the existence of genuine issues of fact concerning both the timing of defendants' actions and defendants' state of mind as to knowledge and intent. The search for the truth within this morass of conflicting assertions and allegations of fraud, conspiracy and perjury will not be an easy one for the finders of fact in this case. Nevertheless, summary judgment for the moving defendants on plaintiffs' claim for tortious interference with the Memorandum of Agreement executed May 25, 1987, is denied.[7]

## IV. Breach of Fiduciary Duty

■ AGR's counterclaim for breach of fiduciary duty rests primarily on the premise that Lygren acted as AGR's broker in connection with the purchase of the Friendship. AGR also argues that this Court should "pierce the corporate veil" and find that each of the plaintiffs is merely an alter ego of Lygren; that Lygren breached his fiduciary duties through his "shell corporations"; that as a result of that breach, "AGR did not participate in the purchase of the vessel under its Scrap Vessel Agreement with Bomar"; and that "AGR thus sustained damages, including lost profits from any resale of the vessel, in the amount of $3,900,000." Memorandum of Law of Defendants American General Resources, Inc. and Richard Jaross ("Def. Mem.") at 77–78. AGR also requests an award of punitive damages.

As both sides agree, a broker is an agent, and owes the fiduciary duties of an agent to a principal. The evidence is uncontroverted that Lygren pursued his own interests and those of the plaintiffs in bidding for the ship, rather than the interests of AGR. If AGR proves the existence of a principal-broker relationship between it and

---

7. The moving defendants neither challenged nor conceded the validity of the Agreement, and the Court expresses no opinion on that issue.

Lygren, such acts by the counterclaim defendants would constitute a breach of the duty of loyalty owed to a principal by a broker/agent. *See* Restatement of Agency (Second) §§ 13 comment a, 387 (1958).

However, the existence of a principal-broker relationship, like that of an agency, is consensual. *See, e.g., Itel Containers Int'l Corp. v. Atlanttraffik Express Serv., Ltd.,* 909 F.2d 698, 702–03 (2d Cir.1990); *In re Shulman Transport Enters.,* 744 F.2d 293, 295 (2d Cir.1984). AGR has not presented conclusive evidence that Lygren or LMS was its broker. AGR presents evidence that Lygren identified himself on his passport as a "ships broker [sic]," *see* DX 1, and that Lygren provided AGR with information concerning the availability of a number of ships other than the Friendship, *see* DX 17, 57, but this evidence does not mandate a finding that Lygren or LMS functioned as AGR's broker for the Friendship.

The moving defendants also present evidence that Lygren communicated with them at various times concerning the status of the Friendship and the possibility of repairing the ship in Romania. *See* DX 22–28. While a trier of fact could infer that Lygren was acting as a broker, another reasonable inference is that asserted by plaintiffs and by Lygren, that the communications concerned a proposed joint venture in which they, as well as AGR, would be principals. Lygren has testified under oath that he merely offered a joint venture to Jaross, which was never agreed upon. *See* DX 1, Deposition of Atle Lygren ("Lygren Depo."), dated Jan. 23, 1989, at 533, 552–54.

That Lygren's testimony may be self-serving is not fatal, as defendants assert; it is for the factfinder to assess the reliability of the evidence offered by the witnesses at trial. *See, e.g., Anderson, supra,* 477 U.S. at 249, 106 S.Ct. at 2510; *R.C. Bigelow, supra,* 867 F.2d at 107. The testimony raises an issue of material fact concerning the relationship among these parties.

While the moving defendants argue, in the alternative, that if no broker-principal relationship was established, a joint venture existed, and that Lygren as their partner in the joint venture owed them a fiduciary duty, a triable issue of fact remains as to whether any joint venture was ever agreed upon. As this Court has previously held, "[t]he existence of a joint venture agreement ... necessarily involves questions of the parties' intent, which is the classic situation where summary judgment is *not* proper." *Sutton Hill Assocs. v. Landes,* 705 F.Supp. 940, 946 (S.D.N.Y. 1989) (Leisure, J.) (emphasis added).

Because of the existence of issues of fact concerning whether the parties ever intended to enter into either a principal-agent relationship or a joint venture, summary judgment on AGR's counterclaim must be denied. The Court therefore need not reach the veil-piercing issue at this stage of the litigation; however, the Court notes the difficulties encountered by parties attempting to pierce the veil under New York law. *See, e.g., Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847 (2d Cir.1985); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club International, Inc.,* 758 F.Supp. 908 (S.D.N.Y.1991) (Leisure, J.).

## V. Damages

Plaintiffs claim damages based on "the intrinsic value and replacement cost of the Brazilian Friendship; the lost earnings which could have been received by chartering her; and their lost profits from the intended use of the vessel as a foundation for further investments in shipping." Plain. Mem. at 71–72. The allegations of lost profits include the profits to have been made from the sale of the shipping business and reinvested in "a more balanced investment portfolio." DX 56. Plaintiffs also seek punitive damages.

The moving defendants challenge the damage allegations on a number of grounds: that a contract rather than a tort measure of damages is appropriate; that plaintiffs must prosecute their arbitration claim against Hydra, which will entitle defendants to a setoff of any recovery by plaintiffs from Hydra; that the claim for lost profits on a "phantom fleet" of future ship purchases is overly speculative; and

that punitive damages are not available as a matter of law.

■ The Second Restatement of Torts states that compensatory damages in an action for interference with a contract may include: "(a) the pecuniary loss of the benefits of the contract ...; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774A(1) (1979). The New York Court of Appeals has noted that a plaintiff is entitled to "the full pecuniary loss of the benefits of the contract," and that "the elements of damages, including consequential damages, would be those recognized under the more liberal rules applicable to tort actions." *Guard–Life, supra,* 50 N.Y.2d at 191 & n. 6, 428 N.Y.S.2d at 636 & n. 6 (citing § 774A(1) comment c).

■ The Restatement also makes clear that an action may be maintained, and damages awarded, for tortious interference despite the availability of an action for breach against the other party to the contract. "[T]he fact that [a] third person is liable for the breach does not affect the amount of damages awardable against the [tort defendant]; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment." Restatement (Second) of Torts § 774A(2); *accord, Simon v. Royal Business Funds Corp.,* 34 A.D.2d 758, 310 N.Y. S.2d 409 (1st Dep't 1970), *aff'd,* 29 N.Y.2d 692, 325 N.Y.S.2d 649, 275 N.E.2d 21 (1971); *Canales v. Stuyvesant Ins. Co.,* 10 Misc.2d 583, 172 N.Y.S.2d 729, 733 (N.Y. Mun.Ct.1958). A plaintiff that has recovered a judgment in a contract action against the breaching party may not "recover more than the amount of damage he suffered.... [I]n the absence of pleading and proof of additional damages resulting from the defendants' tort," the complaint must be dismissed for legal insufficiency. *Simon, supra,* 310 N.Y.S.2d at 411. However, the moving defendants provide no authority for their contention that plaintiffs *must* first seek recovery from Hydra for breach of contract.

■ Comment a to section 774A of the Restatement states that "[s]ince the tort is an intentional one, punitive damages are recovered in these actions under appropriate circumstances." New York law has also recognized that punitive damages may be available on proof of " 'actual malice or ill will,' a wrong 'morally culpable' ... or a wrongful act 'done wilfully, wantonly or maliciously.' " *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 67 A.D.2d 658, 412 N.Y.S.2d 623, 625 (1st Dep't 1979), *aff'd,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) (citations omitted); *see also Universal City Studios, Inc. v. Nintendo Co.,* 615 F.Supp. 838, 863 (S.D.N.Y. 1985), *aff'd,* 797 F.2d 70, 77–78 (2d Cir. 1986) (applying New York law); *Fury Imports, Inc. v. Shakespeare Co.,* 554 F.2d 1376, 1388–89 (5th Cir.1977) (applying New York law); *Canales, supra,* 172 N.Y.S.2d at 733.

■ The requirement that a plaintiff prove its damages with reasonable certainty, *see* Restatement (Second) of Torts § 912, precludes plaintiffs' recovery for projected profits from a new business of which the Friendship allegedly was to be the cornerstone. "The prospective profits of a new business or enterprise are regarded as being too remote, contingent, and speculative to meet the legal standard of reasonable certainty in determining the elements of recoverable damages in an action for breach of a contract *or for a tort.*" 36 N.Y.Jur.2d Damages § 110, at 193–94 (1984) (emphasis added); *see also Askey v. Occidental Chemical Corp.,* 102 A.D.2d 130, 136–37, 477 N.Y.S.2d 242, 247 (4th Dep't 1984) (contingent or speculative consequential damages not available in tort).

In sum, moving defendants' motion for partial summary judgment on the issue of damages is granted in part and denied in part. Plaintiffs' claims for damages based on projected profits stemming from investment and reinvestment of the profits to be realized from the Friendship are dismissed. Any damages claimed solely by LMS must, of course, be omitted. However, plaintiffs

may prove at trial damages related to the Friendship itself, including replacement cost and lost earnings from chartering and resale of the vessel. In addition, upon sufficient evidence at trial of moral culpability on the part of defendants, punitive damages may be available.

## CONCLUSION

For the reasons set forth above, the motion of defendants AGR and Jaross for summary judgment dismissing the claim is granted in part and denied in part.

The claims of plaintiff LMS are dismissed. The claims of plaintiffs IMR and ISC for tortious interference with contractual or prospective contractual relations, to the extent they are grounded in the acts of the moving defendants prior to May 25, 1987, are dismissed. The motion is otherwise denied.

AGR's motion for summary judgment on its counterclaim is denied. The moving defendants' motion for partial summary judgment on the issue of damages is granted in part and denied in part, as described above.

Memoranda of law submitted by any party on any motion for reargument of this motion should be no longer than 15 pages.

SO ORDERED.